Slip Op. 16-82

UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| SEAH STEEL VINA CORPORATION,<br><br>　　　　　　　　　Plaintiff,<br><br>v.<br><br>UNITED STATES,<br><br>　　　　　　　　　Defendant,<br><br>　and<br><br>MAVERICK TUBE CORPORATION,<br>UNITED STATES STEEL CORPORATION,<br>BOOMERANG TUBE LLC, ENERGEX<br>TUBE (A DIVISION OF JMC STEEL<br>GROUP), TEJAS TUBULAR PRODUCTS,<br>TMK IPSCO, VALLOUREC STAR, L.P., and<br>WELDED TUBE USA INC.,<br><br>　　　　　　　　　Defendant-Intervenors. | Before: Richard W. Goldberg, Senior Judge<br>Consolidated Court No. 14-00224<br><br>**PUBLIC VERSION** |

### OPINION AND ORDER

[The court remands in part and sustains in part the final antidumping duty determination on oil country tubular goods from the Socialist Republic of Vietnam.]

Dated: August 31, 2016

*Jeffrey M. Winton*, Law Office of Jeffrey M. Winton PLLC, of Washington DC, argued for plaintiff.

*Emma E. Bond*, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, argued for defendant. With her on the brief were *Benjamin C. Mizer*, Principal Deputy Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Claudia Burke*, Assistant Director. Of counsel on the brief was *Whitney Rolig*, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce, of Washington, DC.

*Jeffrey D. Gerrish* and *Luke A. Meisner*, Skadden, Arps, Slate, Meagher & Flom LLP, of Washington, DC, argued for defendant-intervenor United States Steel Corporation.  With them on the brief was *Robert E. Lighthizer*.

*Alan H. Price*, *Adam M. Teslik*, *Laura El-Sabaawi*, *Robert E. DeFrancesco, III*, Wiley Rein, LLP, of Washington DC, for defendant-intervenor Maverick Tube Corporation.

*Roger B. Schagrin*, *John W. Bohn*, *Paul W. Jameson*, Schagrin Associates, of Washington DC, for defendant-intervenors Boomerang Tube LLC, Energex Tube (a Division of JMC Steel Group), Tejas Tubular Products, TMK IPSCO, Vallourec Star, L.P., and Welded Tube USA Inc.

Goldberg, Senior Judge: This case resolves challenges to the final antidumping duty determination of the U.S. Department of Commerce ("Commerce") for oil country tubular goods ("OCTG") from the Socialist Republic of Vietnam ("Vietnam").  *See Certain Oil Country Tubular Goods from the Socialist Republic of Vietnam*, 79 Fed. Reg. 41,973 (Dep't Commerce July 18, 2014) (final determ.) ("*Final Determination*"), as amended by *Certain Oil Country Tubular Goods from India, the Republic of Korea, Taiwan, the Republic of Turkey, and the Socialist Republic of Vietnam*, 79 Fed. Reg. 53,691 (Dep't Commerce Sept. 10, 2014) (amended final determ.).

Both Plaintiff, SeAH Steel VINA Corporation ("SSV"), and Defendant-Intervenor, United States Steel Corporation ("U.S. Steel"), moved for judgment on the agency record under USCIT Rule 56.2.  SSV challenges five aspects of the *Final Determination*.  Pl.'s Mot. for J. on Agency R. 4–11, ECF No. 54 ("SSV Br.").  U.S. Steel challenges four aspects of the *Final Determination*.  Def.-Intervenor's Mot. for J. on Agency R. 6–8, ECF No. 56 ("U.S. Steel Br.").  For the reasons set forth below, the court remands the *Final Determination* to Commerce for reconsideration on all but one of the challenges.

## GENERAL BACKGROUND

When foreign merchandise sold for less than fair value in the United States injures or threatens a domestic industry, the United States collects antidumping duties on the merchandise. *See* 19 U.S.C. § 1673 (2012). To calculate antidumping duties, Commerce contrasts the "export price (or the constructed price)" of the merchandise with the "normal value" ("NV") of the merchandise. *Id.* §§ 1673, 1677b(a). In general, the export price reflects the price of the merchandise in the United States, and the normal value is the price of the merchandise in the exporting country. *Id.* §§ 1677a–1677b.

The method of calculating NV hinges on whether the merchandise comes from an exporter in a market economy ("ME") or an exporter in a nonmarket economy ("NME"). *Id.* § 1677b(a)(1), (c)(1). If the merchandise originates in a ME, Commerce typically uses the price of the merchandise in the exporting country. *Id.* § 1677b(a)(1)(B)(i). But here the source of OCTG is Vietnam, which is a NME. Surrogate Country Selection Mem., PD 186 (Apr. 10, 2014), ECF No. 60.

When merchandise originates in a NME, Commerce bases the NV of the goods on "the value of the factors of production utilized in producing the merchandise" plus an "amount for general expenses and profit plus the cost of containers, coverings, and other expenses." 19 U.S.C. § 1677b(c)(1)(B). However, in NME countries, the law presumes that government action distorts the cost of the factors of production ("inputs") actually used to produce the merchandise. *Blue Field (Sichuan) Food Indus. Co. v. United States*, 37 CIT __, __, 949 F. Supp. 2d 1311, 1316–17 (2013). Because Commerce cannot use the distorted input prices of a NME, Commerce calculates and ascribes a "surrogate value" representing a market price to each of the inputs. 19 U.S.C. § 1677b(c)(1)(B). Commerce must base its calculation of each surrogate value on "the

best available information regarding the values of such factors in a [ME] country." *Id.*

Additionally, Commerce must use "the prices or costs of [inputs]" in a ME country that is "at a

level of economic development comparable to that of the [NME]" and that is a "significant

producer[] of comparable merchandise." *Id.* § 1677b(c)(4).

Here, Commerce uses surrogate values from India to calculate the NV.  Surrogate Country

Selection Mem., PD 186 (Apr. 10, 2014), ECF No. 60.  After determining the surrogate values,

Commerce calculates an amount corresponding to other production expenses and profits.  *Id.* §

1677b(c)(1)(B).  Specifically, "[b]ecause firms have 'general expenses and profits' not traceable

to a specific product, in order to capture these expenses and profits, Commerce must factor [into

the NV calculation] (1) factory overhead ('overhead'), (2) selling, general and administrative

expenses ('SG&A'), and (3) profit." *Mittal Steel Galati S.A. v. United States*, 31 CIT 1121,

1137–38, 502 F. Supp. 2d 1295, 1310 (2007).  To calculate and incorporate these factors,

"Commerce relies upon financial statements from one or more [surrogate] companies based in

the primary surrogate country." *Id.*  Commerce then combines the total expenses, profits, and

surrogate input values to create NV.  19 U.S.C. § 1677b(c)(1)(B).

With regard to export price, the relevant background is simpler.  To resolve this case, the

court need mention only one rule: When calculating export price, or the price of the merchandise

in the United States, Commerce must deduct "the amount . . . attributable to any additional costs,

charges, or expenses, and United States import duties, which are incident to bringing the subject

merchandise from the original place of shipment in the exporting country to the place of delivery

in the United States." 19 U.S.C. § 1677a(c)(2)(A).

After calculating both the export price and the NV, Commerce determines the "dumping margin," which is the "amount by which the [NV] exceeds the export price." *Id*. § 1677(35)(A). This is the foundation of the antidumping duties owed on the foreign merchandise. *Id.* § 1673.

In making the above determinations, Commerce relies on the information in the administrative record, including information submitted by the parties. To gather information from the parties, Commerce issues questionnaires and reviews the resultant submissions of data from the parties. 19 C.F.R. § 351.221(b)(2). Commerce may subsequently issue supplemental questionnaires requesting additional information. *Id.* § 351.301. If a party is unforthcoming with information, Commerce sometimes applies adverse facts available ("AFA"), which entails making inferences unfavorable to the uncooperative party. *Id.* § 1677e(a). After reviewing the administrative record, Commerce issues the preliminary results of its calculation on the dumping margin. 19 C.F.R. § 351.221(b)(4). Interested parties may then submit case briefs and rebuttal case briefs to challenge the findings in the preliminary results. *Id.* Commerce completes the process by reviewing the challenges and issuing its final determination. *Id.* § 351.221(b)(5).

U.S. Steel and SSV each argue that Commerce improperly calculated antidumping duties on OCTG. U.S. Steel challenges four aspects of Commerce's calculation. First, U.S. Steel argues that Commerce erred in refusing to apply partial AFA to SSV. Second, U.S. Steel contests Commerce's valuation of SSV's hot-rolled coil input. Third, U.S. Steel argues that Commerce improperly excluded the cost of the domestic inland insurance that SSV allegedly used to transport OCTG. And fourth, U.S. Steel opposes Commerce's selection of financial statements for use in calculating the financial statement ratios. U.S. Steel Br. 6–8. The court remands on the second, third, and fourth issues.

SSV challenges five aspects of Commerce's calculation. First, SSV argues that Commerce

erred when deducting from the export price the brokerage and handling costs on SSV's exports

of OCTG.  Second, SSV contests the decision to adjust the normal value by adding a surrogate

value for brokerage and handling services on SSV's imports of inputs.  Third, SSV argues that

Commerce incorrectly allocated the surrogate values for brokerage and handling services on

SSV's imports of inputs and exports of OCTG.  Fourth, SSV opposes the selection of financial

statements used to calculate the financial-statement ratios.  And fifth, SSV challenges

Commerce's decision to adjust the normal value to account for yield loss on OCTG.  SSV Br. 4–

11.  The court remands for Commerce to reconsider all five issues.

## JURISDICTION AND STANDARD OF REVIEW

The court exercises jurisdiction to hear this appeal under 28 U.S.C. § 1581(c).  The court will

sustain the antidumping duty determination unless the court concludes that the determination is

"unsupported by substantial evidence on the record, or otherwise not in accordance with the

law."  19 U.S.C. § 1516a(b)(1)(B)(i).  Substantial evidence amounts to "more than a mere

scintilla" of evidence.  *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951) (citation

omitted).  It is "such relevant evidence as a reasonable mind might accept as adequate to support

a conclusion."  *Id.* (citation omitted).  "Even if it is possible to draw two inconsistent conclusions

from evidence in the record, such a possibility does not prevent Commerce's determination from

being supported by substantial evidence." *American Silicon Techs. v. United States*, 261 F.3d

1371, 1376 (Fed. Cir. 2001).

## DISCUSSION

The court remands on all issues except the challenge to Commerce's refusal to apply partial

adverse facts available to SSV.

I.    **Substantial Evidence Supported Commerce's Refusal to Apply Partial Adverse Facts Available to SSV, but the Court Remands for Further Explanation of Commerce's Valuation of Hot-Rolled Coils.**

U.S. Steel argues that Commerce erred in refusing to apply partial AFA to SSV.  U.S. Steel Br. 6–7.  In particular, U.S. Steel contends that Commerce should apply partial AFA because SSV improperly responded to Commerce's requests for information regarding SSV's use of hot-rolled coil ("HRC").  *Id.*

U.S. Steel also argues that Commerce incorrectly valued the HRC that SSV consumed in the production of OCTG.  U.S. Steel Br. 21.  Commerce valued the entirety of SSV's HRC input without separately valuing the three variations of HRC that SSV used.  I&D Mem. 34.  Thus, U.S. Steel maintains that "Commerce's decision not to value the three types of [HRC] separately ignored its established practice, disregarded the significant physical and cost differences between the three types of [HRC], and contravened the statute's mandate."  U.S. Steel Br. 21.

The court finds that Commerce did not err when refusing to apply partial AFA to SSV.  However, the court remands for a detailed explanation or, if necessary, a revision of Commerce's failure to value separately the three variations of HRC.

A.  **Background**

As explained above, when companies from a NME export merchandise, Commerce typically "determine[s] the normal value of the subject merchandise on the basis of the value of the factors of production utilized in producing the merchandise."  19 U.S.C. § 1677b(c)(1)(B).  This "valuation of the factors of production shall be based on the best available information regarding the values of such factors in a [ME] country."  *Id.*  In accordance with this statute, Commerce requested information regarding SSV's factors of production.  Commerce Questionnaire to SSV, PD 56–59 (Aug. 23, 2013), ECF No. 92.

On August, 23, 2013, Commerce asked SSV in its Section D Questionnaire to disclose "each type and grade of material used in the production process." *Id.* at D-8. Within the deadline, SSV disclosed that it consumed "API J55" HRC. SSV Resp. to Sections C&D Questionnaire app. D-4-C ("C&D Resp."), PD 87–91 (Oct. 30, 2013), ECF No. 60. SSV also disclosed that [[       ]] of the HRC came from ME suppliers and [[       ]] came from NME suppliers. C&D Resp. app. D-6, CD 21–28 (Oct. 30, 2013), ECF No. 60. In December of 2013, Commerce asked SSV to "[p]rovide a sample invoice for the purchase of each input." Commerce's Suppl. Section D Questionnaire 14, PD 96 (Dec. 12, 2013), ECF No. 60. On January 13, 2014, SSV timely submitted an invoice regarding a purchase of HRC from [[                          ]]. SSV Resp. to Suppl. Section D Questionnaire ("Suppl. D Resp.") app. SD-10, CD 36–39 (Jan. 13, 2014), ECF No. 60. This information indicated that SSV purchased and received [[

    ]] *id.*, which contains a chromium content of [[       ]], Verification Report 23, CD 154 (May 7, 2014), ECF No. 73-3.

In its supplemental questionnaire dated January 28, 2014, Commerce asked SSV if "any of [SSV's] U.S. sales involved pipes which, when shipped to the United States, were upgradeable merchandise (e.g., upgradeable J55 that actually meets all the requirements of the API 5CT specification"). Suppl. D Resp. 10. Within the established deadline, SSV responded that, in addition to "normal J-55 steel coil," which has a carbon content of 0.13 percent, it used "upgradeable J-55 coil," which has a carbon content of 0.25 percent. *Id.*; *see also* Pl.'s Resp. to Def.-Intervenor's Mot. for J. on Agency R. 10 n.13, ECF No. 66.

### B. Substantial Evidence Supported Commerce's Decision to Not Apply Partial Adverse Facts Available to SSV.

U.S. Steel argues that Commerce acted without the support of substantial evidence in failing to apply partial AFA to SSV. U.S. Steel Br. 13. U.S. Steel asserts that when disclosing its

factors of production, SSV "failed to provide accurate information regarding its upgradable [J55

HRC] within the deadlines established by Commerce and withheld information regarding" its use

of high-chromium J55 HRC.  *Id.* at 12.  Simply put, U.S. Steel maintains that SSV should have

disclosed in its first response to Commerce all of the above variations of J55 HRC.  *Id.* at 6–7.

This alleged misconduct, U.S. Steel argues, required application of partial AFA.  *Id.* at 13.

In making its antidumping determinations, Commerce may sometimes "use the facts

otherwise available in reaching the applicable determination."  19 U.S.C. § 1677e(a).  Commerce

can use "facts otherwise available" when a respondent "withholds [requested] information,"

"fails to provide such information by the [applicable] deadlines," fails to provide the information

"in the form and manner requested," "significantly impedes a proceeding," or provides

"information [that] cannot be verified."  *Id.* § 1677e(a)(2).  But Commerce can sometimes do

more.  It "*may* use an inference that is adverse to the interests of [a] party in selecting from

among the facts otherwise available."  *Id.* § 1677e(b)(1) (emphasis added).  However, Commerce

may use this adverse inference only if it "finds that [the] interested party has failed to cooperate

by not acting to the best of its ability to comply with a request for information."  *Id.*  An

interested party fails to act to "the best of its ability" when it does not "put forth its maximum

effort to provide Commerce with full and complete answers to all inquiries in an investigation."

*Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1382 (Fed. Cir. 2003).  "[T]he standard does

not require perfection and recognizes that mistakes sometimes occur."  *Id*.  Nonetheless,

"inattentiveness, carelessness, [and] inadequate record keeping" constitute a failure to act to the

best of one's ability.  *Id*.  The application of this standard is within Commerce's domain:  "It is

well-established that Commerce enjoys broad discretion when considering whether to apply

adverse facts available in antidumping proceedings." *Tianjin Magnesium Int'l Co. v. United States*, 36 CIT __, __, 844 F. Supp. 2d 1342, 1346 (2012).

Here, the record demonstrates that substantial evidence supported Commerce's conclusion that the application of partial AFA was unwarranted. Commerce found that, with regard to the J55 HRC, SSV withheld no requested information, provided all information within the established deadlines and in the manner requested, and did not significantly impede the investigation. I&D Mem. 32–34. As stated above, in its Section D questionnaire on August 23, 2013, Commerce requested that SSV "[d]escribe each type and grade of material used in the production process." Commerce Questionnaire to SSV at D-8, PD 56–59 (Aug. 23, 2013), ECF No. 92. Within the established deadline, SSV identified solely J55 HRC. C&D Resp. app. D-4-C, PD 87–91 (Oct. 30, 2013), ECF No. 60. The Section D questionnaire, which deals with the factors of production used to make OCTG, provided no definition for "type and grade." But in the Section C questionnaire, which deals with U.S. sales of OCTG, Commerce allowed SSV to provide answers according to the American Petroleum Institute's ("API") OCTG standards. Commerce Questionnaire to SSV at C-9. The API specifications do not distinguish between upgradeable J55 HRC, nonupgradeable J55 HRC, and J55 HRC with an elevated Chromium composition. *Id.* Consequently, J55 HRC encompasses upgradeable and nonupgradeable HRC, as well as HRC with an elevated Chromium content. *Id.* In other words, under the API specifications, the variations in SSV's J55 HRC inputs do not amount to different "types."

Without additional guidance from Commerce in its Section D questionnaire, it was reasonable for SSV to answer the Section D questionnaire by disclosing its HRC input using the API specifications, which treat the above J55 HRC variations as one "type and grade." As a result, SSV provided an honest and reasonably accurate answer when it disclosed solely J55

HRC in its first Section D response without also disclosing upgradeable J55 HRC and high-chromium J55 HRC. Commerce, therefore, reasonably concluded that SSV properly provided the requested information within the deadlines (and, by extension, did not withhold the information). *See* 19 U.S.C. § 1677e(a)(2). And because SSV complied with the demands of the investigation, it did not impede the investigation. *Id.* For that reason, Commerce refused to apply partial AFA, and substantial evidence supports the refusal. [1]

### C. Commerce Did Not Act Arbitrarily in Refusing to Apply Partial Adverse Facts Available to SSV.

U.S. Steel also argues that Commerce's refusal to apply partial AFA to SSV contravened the law because Commerce inexplicably and unjustifiably disregarded its alleged practice of applying AFA to respondents behaving comparable to SSV. U.S. Steel Br. 18.

"[I]t is well-established that 'an agency action is arbitrary when the agency offer[s] insufficient reasons for treating similar situations differently.'" *SKF USA Inc. v. United States*, 263 F.3d 1369, 1382 (Fed. Cir. 2001) (alteration in original) (citation omitted). Commerce acts arbitrarily and violates the law when it "consistently followed a contrary practice in similar circumstances and provided no reasonable explanation for the change in practice." *Consol. Bearings Co. v. United States*, 348 F.3d 997, 1007 (Fed. Cir. 2003). "'An action . . . becomes an 'agency practice' when a uniform and established procedure exists that would lead a party, in the

---

[1] As explained above, Commerce cannot apply partial AFA without (1) finding a problem with a respondent's response *and* (2) finding that the respondent failed to cooperate to the best of its ability. 19 U.S.C. § 1677e. And "[t]his court has made clear that [Commerce's discretion to apply AFA] does not saddle Commerce with the burden of showing that an importer cooperated to the best of its ability every time it determines that adverse facts available should not be applied." *Tianjin*, 36 CIT at __, 844 F. Supp. 2d at 1346; *see also AK Steel Corp. v. United States*, 28 CIT 1408, 1417, 346 F.Supp.2d 1348, 1355 (2004) (explaining that it "runs counter to the discretion afforded to Commerce" to require Commerce to "prove that an importer cooperated to the best of its ability every time that the agency decides *not* to apply adverse facts available"). Commerce found no issue with SSV's responses (the first of the two requirements). Consequently, even though it could have done so, Commerce chose not to address the second of the two requirements. But to prove partial AFA warranted in this case, U.S. Steel would also have to show that SSV failed to act to the best of its ability—perhaps a tall order on these facts.

absence of notification of a change, reasonably to expect adherence to the [particular action] or procedure." *Huvis Corp. v. United States*, 31 CIT 1803, 1811, 525 F. Supp. 2d 1370, 1378 (2007) (alteration in original) (citation omitted).  That said, given Commerce's "broad discretion" to apply partial AFA, *Tianjin*, 36 CIT at __, 844 F. Supp. 2d at 1346, it is especially difficult for a party to demonstrate that it "reasonably . . . expect[ed] adherence" to an allegedly "uniform and established procedure" of always applying partial AFA, *Huvis Corp.*, 31 CIT at 1811, 525 F. Supp. 2d at 1378.

U.S. Steel cites a list of cases in its attempt to demonstrate an established practice in which Commerce previously applied AFA whenever a respondent behaved like SSV here.  Yet these cases are inapplicable because, unlike here, the respondents in the cited cases did not comply with Commerce's requests.  *See* I&D Mem. 32–34.  For example, in both *Yantai Xinke Steel Structure Co. v. United States*, Slip Op. 12-95, 2012 WL 2930182, at *6–14 (CIT July 18, 2012), and *Jiangsu Changbao Steel Tube Co. v. United States*, 36 CIT __, __, 884 F. Supp. 2d 1295, 1300–01 (2012), the court sustained the application of AFA to respondents who, unlike SSV, inaccurately disclosed their factors of production.  Accordingly, any established practice emanating from the cited cases is irrelevant to Commerce's refusal to apply partial AFA to SSV.[2]  By extension, Commerce did not act arbitrarily in violation of the law.[3]

---

[2] Also, in all but one of the cases that U.S. Steel cites, this court affirmed Commerce's decision to apply AFA, rather than overturning a decision not to apply AFA.  U.S. Steel Br. 20.  In the only outlier, the importer submitted fabricated documents to Commerce, which self-evidently signals that the importer failed to comply with Commerce's requests and failed to "cooperate to the best of its ability."  *Tianjin*, 36 CIT at __, 844 F. Supp. 2d at 1347.  Unlike the respondent in *Tianjin*, SSV's behavior evidenced no flagrant failure to fully cooperate with Commerce.  Thus, the sole cited instance of this court overturning a refusal to apply AFA is even more inapplicable than the other cases.  Moreover, this court has previously refused to overrule Commerce's failure to apply AFA even when the respondent, also unlike SSV, struggled to comply with Commerce's requests and disclosed information past deadlines.  *Ad Hoc Shrimp Trade Action Comm. v. United States*, 33 CIT 533, 548–50, 616 F. Supp. 2d 1354, 1368–69 (2009).  Accordingly, there is no practice that required Commerce to apply partial AFA to SSV, a respondent that fully complied.

[3] U.S. Steel also argues that failure to apply AFA to SSV violates the purpose of the AFA provision.  U.S. Steel Br. 18, 20.  The purpose of the AFA provision "is 'to provide respondents with an incentive to cooperate' with

### D. The Court Remands for Further Explanation or Reconsideration of Commerce's Valuation of J55 Hot-Rolled Coil.

U.S. Steel argues that Commerce erred when it did not separately calculate the values of the three types of J55 HRC that SSV consumed.  U.S. Steel Br. 21.  The court finds that Commerce insufficiently explained its valuation decision, leaving the court without enough information to review the decision.  As a result, the court remands for further explanation or, if Commerce chooses, recalculation of Commerce's valuation of HRC.[4]

"In determining the valuation of the factors of production, the critical question is whether the methodology used by Commerce is based on the best available information and establishes antidumping margins as accurately as possible."  *Shakeproof Assembly Components, Div. of Illinois Tool Works, Inc. v. United States*, 268 F.3d 1376, 1382 (Fed. Cir. 2001).  Commerce has "wide discretion in the valuation of factors of production."  *Id.*  Nonetheless, "a reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency."  *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947); *see also Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (stating that "the agency must examine the relevant data and articulate a satisfactory explanation" without any attempt by the reviewing court to "make up for [any] deficiencies").  This court, therefore, cannot provide a rationale for Commerce's refusal to value separately each variation of J55 HRC.

---

Commerce's investigation." *Essar Steel Ltd. v. United States*, 678 F.3d 1268, 1276 (Fed. Cir. 2012) (citation omitted).  "Without the ability to enforce full compliance with its questions, Commerce runs the risk of gamesmanship and lack of finality in its investigations." *Id.*  U.S. Steel's argument is unpersuasive because, as stated above, SSV complied with Commerce's requests.  Accordingly, application of partial AFA is unnecessary because SSV's conduct incentivizes neither gamesmanship nor a lack of cooperation.

[4] *See Diamond Sawblades Mfrs. Coal. v. United States*, 612 F.3d 1348, 1357 (Fed. Cir. 2010) (providing the court with discretion to remand for further explanation when the record before the court "'need[s] further explanation in order for the court to understand and properly evaluate the agency's action'" (citation omitted)).

Here, Commerce obtained information showing that SSV purchased three variations of J55 HRC.  First, record evidence confirms that SSV purchased regular J55 HRC with a carbon content of 0.13 percent from ME sources.  Suppl. D Resp. 10, PD 142–143 (Feb. 5, 2014), ECF No. 60.  Second, record evidence shows that SSV purchased upgradeable J55 with a carbon content of 0.25 percent from ME sources.  *Id.*  Third, record evidence confirms that SSV purchased J55 HRC containing a heightened chromium content of [[     ]] percent from [[

]].  Verification Report 23, CD 154 (May 7, 2014), ECF No. 73-3.  Regular J55 HRC from ME sources contains only [[                          ]].  SSV Verification Exs. at Ex. 14, CD 71–150 (Apr. 14, 2014), ECF No. 92.  When calculating the value of OCTG inputs, Commerce used SSV's "average [ME] purchase price of [J55 HRC] during the" period of investigation rather than calculating a separate value for each of the above variations of J55.  I&D Mem. 34.  U.S. Steel insists that Commerce erred in failing to separately value the three variations.

In particular, U.S. Steel argues that Commerce violated the statutory requirement that Commerce determine dumping margins using "the best available information." 19 U.S.C. § 1677b(c)(1).  U.S. Steel argues that Commerce's established practice "is to base surrogate values on prices for materials that most closely reflect the specific grades and chemical compositions of the inputs consumed in the production of the subject merchandise."  U.S. Steel Br. 22, 26.[5]  U.S. Steel highlights record evidence demonstrating the potential differences among the three variations of J55 HRC.  U.S. Steel Br. 23–27.  Specifically, U.S. Steel contends that the

---

[5] U.S. Steel cites the following proceedings: (1) *Pure Magnesium from the People's Republic of China*, 76 Fed. Reg. 76,945 (Dep't Commerce Dec. 9, 2011) (final results) and accompanying I&D Mem. at cmt. 7; (2) *Certain Ball Bearings and Parts Thereof from the People's Republic of China*, 68 Fed. Reg. 10,685 (Dep't Commerce Mar. 6, 2003) (final determ.) and accompanying I&D Mem. at cmt. 44; and (3) *Certain Cut-To-Length Carbon Steel Plate from the People's Republic of China*, 62 Fed. Reg. 61,964 (Dep't Commerce Nov. 20, 1997) (final determ.) and accompanying I&D Mem. at cmt. 16.

three variations of J55 coil have varying compositions and prices, making it necessary to separately value each HRC variation to achieve the most accurate dumping margins. *Id*. at 28.[6]

Commerce provides little explanation for its refusal to value separately each variation of J55 HRC. It first concludes that "[t]he differences between the three types of J55 are not so substantial as to make them different products requiring separate valuations." I&D Mem. 34. On that basis, Commerce states, it "valued SSV's coil using its average [ME] purchase price of [HRC] during the [period of investigation], as [it] did in the *Preliminary Determination*." *Id*. In the *Preliminary Determination*, Commerce followed a then-established practice that the agency previously announced in the *Federal Register*. Prelim. Decision Mem. 12 & n.44, PD 245 (Feb. 14, 2014), ECF No. 73-2. Under that practice, Commerce granted

> a rebuttable presumption that [ME] input prices are the best available information for valuing an entire input when the total volume of the input purchased from all [ME] sources during the period of investigation or review exceeds 33 percent of the total volume of the input purchased from all sources.

*Antidumping Methodologies: Market Economy Inputs, Expected Non-Market Economy Wages, Duty Drawback; and Requests for Comments*, 71 Fed. Reg. 61,716, 61,717–18 (Dep't Commerce Oct. 19, 2006)). Thus, "[w]hen a[] NME producer purchase[d] inputs from [ME] suppliers and pa[id] in a [ME] currency, [Commerce] normally use[d] the average actual price paid by the NME producer for these inputs to value the [entire] input in question." *Id.* at 61,716.

If this practice applies to Commerce's valuation of HRC, Commerce properly valued the

---

[6] Unlike ordinary J55, the higher carbon content of upgradeable J55 allows for conversion from J55-grade OCTG to L80-grade OCTG. Suppl. D Resp. 10. L80-grade hot-rolled coil has a yield strength ranging from 552 Mega-Pascals ("MPa") to 655 MPa, while J55-grade hot-rolled coil has a yield strength from 379 MPa to 552 MPa. SSV Section A Resp. at app. A-8, PD 73–77 (Sept. 24, 2013), ECF No. 60. L80 has a minimum tensile strength of 655 MPa, while J55 has a minimum tensile strength of 517 MPa. *Id.* L80 has a Rockwell Hardness of 23 and a Brinell Hardness of 241; J55 has no specified hardness. *Id.* Likewise, U.S. Steel also asserts that, compared to regular J55, high-chromium J55 HRC renders the steel more immune to corrosion. U.S. Steel Br. 25. What is more, U.S. Steel argues that, with a [[                    ]], the HRC that SSV purchased qualifies as alloy steel rather than carbon steel under Harmonized Tariff Schedule codes. *Id.* at 25, 27. U.S. Steel also argues that there are appreciable price differences between the regular J55, the upgradable J55, and the high-chromium J55. *Id.* at 24–25.

HRC input because, as the practice dictates, it used the average price of ME purchases of J55

HRC.  But Commerce must satisfy two conditions before applying this practice.  First, the

practice applies, by its own terms, only if the ME J55 HRC that SSV purchased with ME

currency amounted to 33 percent or more of the total quantity of J55 HRC that SSV purchased

during the period of investigation.  *Id.* at 61,717–18.   Second, and again by its own terms, the

practice applies only if the three variations of J55 HRC constitute the same input.  *Id.*  Here,

Commerce satisfies the first condition because SSV purchased [[          ]] of its J55 HRC in ME

currency from ME suppliers.  C&D Resp. app. D-6, CD 25 (Oct. 30, 2013), ECF No. 73-3.  As a

result, if the three variations of J55 HRC constitute the same input, Commerce satisfied both

conditions for applying its established practice when it valued the entire J55 HRC input of SSV

using exclusively the ME purchases of J55 HRC.

But Commerce insufficiently explained its decision to classify the three variations of J55

HRC as the same input.  Rather than clarify its decision to conflate three reputedly differing J55

HRCs, Commerce merely stated that "[t]he differences between the three types of J55 are not so

substantial so as to make them different products requiring separate valuations."  I&D Mem. 34.

This statement provides no explanation; it simply offers a conclusion.

And so it is unclear whether Commerce justifiably used the above established practice to

value all of the J55 HRC based solely on the ME purchases of J55 HRC.  Although Commerce

may be correct, it has not satisfied its obligation to say why it is correct.  This court, therefore,

cannot "properly review [Commerce's] conclusions based on its explanations and its citations to

the data."  *Diamond Sawblades Mfrs. Coal. v. United States*, 612 F.3d 1348, 1358 (Fed. Cir.

2010).  Accordingly, the court remands for further detailed explanation regarding Commerce's

decision to value all J55 HRC based on the purchase of a single variation of J55 HRC.

Commerce must explain why it treated the three variations as a single input.  Alternatively,

Commerce has the discretion to recalculate the value of the HRC.

## II.     The Court Remands for Further Explanation of Commerce's Refusal to Value and Deduct SSV's Alleged Domestic Inland Insurance from the Export Price.

U.S. Steel contends that, contrary to Commerce's finding, SSV "paid for and received

insurance associated with transporting the subject merchandise by inland freight from its plant to

the port in Vietnam."  U.S. Steel Br. 28.  As a result, U.S. Steel maintains that Commerce

"should have valued the cost of such insurance and deducted it as a movement expense from" the

export price, "[c]onsistent with its decisions in prior cases."  *Id.*  The court concludes that

Commerce failed to adequately explain its conclusion that SSV's contract with the freight

forwarder included no insurance provision.

### A.  Background

Under 19 U.S.C. § 1677a(c)(2)(A), Commerce must reduce the export price by "the amount,

if any, . . . attributable to any additional costs, charges, or expenses . . . which are incident to

bringing the subject merchandise from the original place of shipment in the exporting country to

the place of delivery in the United States."  U.S. Steel believes that SSV purchased insurance

from [[                                                                                              ]] and that Commerce should have

valued and deducted the cost of this insurance from the export price pursuant to 19 U.S.C. §

1677a(c)(2)(A), consistent with the agency's past practice.  U.S. Steel Br. 28.

The contract between SSV and [[          ]] required [[          ]] to transport OCTG from

SSV's plant to the port in Vietnam.  SSV Suppl. Section A and C Resp. ("Suppl. A&C Resp.")

app. SC-5, CD 31–35 (Jan. 9, 2014), ECF No. 60.  The contract states that [[

                                                                                              ]] *Id.*  The contract

also includes the following provision:

[[


]]

*Id.*  Additionally, the contract states that the price includes [[                              ]] *Id.*  The

contract apparently does not limit [[          ]] liability to accidents or damage for which [[

]] is responsible.  U.S. Steel Br. 30.  According to U.S. Steel, this establishes that [[          ]]

charged SSV for both shipment and insurance of the OCTG.  *Id.* at 28–29.  SSV, however,

denied paying for insurance.  SSV Resp. to Section C Questionnaire 28 ("C Resp."), CD 22 (Oct.

30, 2013), ECF No. 73-3.

Commerce agreed with SSV and classified the language as a "risk of loss" provision, not an

insurance contract.  I&D Mem. 41.  On that basis, Commerce determined the surrogate value of

SSV's inland freight costs without calculating a separate surrogate value for inland freight

insurance.  *Id.*

## B.  Discussion

To prove that Commerce erred, U.S. Steel first focuses on the language of the contract

between SSV and [[          ]].  U.S. Steel Br. 28–29.  According to U.S. Steel, the language

unequivocally establishes an insurance contract between the two entities, as well as agreements

for a number of other services.  *Id.*  Next, U.S. Steel explains that Commerce has an established

practice of separately valuing domestic inland insurance when the insurance is purchased "in

conjunction with the provision of another service."  *Id.* at 29.  Thus, if the agreement between

SSV and [[          ]] to transport the OCTG also created an insurance contract, Commerce must

either follow its alleged practice of valuing the insurance or explain the reasons for its departure.

*Id.* at 33.  U.S. Steel concludes that Commerce's explanation has no record support.  *Id.* at 28–

33.

Commerce provides scant insight into its decision.  It believes that the contract language

merely transfers the "risk of loss" from SSV to [[          ]].  I&D Mem. 41.  As evidence,

Commerce states that "it is not uncommon for trucking companies to bear the risk of loss on the

shipments they handle."  *Id.*  Commerce then states that it "do[es] not find that the bearing of

such risk constitutes an 'insurance contract' that would require a separate surrogate value."  *Id.*

Yet Commerce provides no explanation for why it believes that trucking companies commonly

carry the risk of loss.  Nor does it give any reasons for its refusal to classify the language of the

freight agreement as an insurance contract requiring a separate surrogate value.  This is not

enough.

This court "may not supply a reasoned basis for the agency's action that the agency itself has

not given."  *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43 (citing *Chenery*, 332 U.S. at 196).  Here,

Commerce supplied no reasoned basis.  For that reason, the court cannot "properly review

[Commerce's] conclusions based on its explanations and its citations to the data."  *Diamond

Sawblades*, 612 F.3d at 1358.  As a result, the court remands for further explanation of

Commerce's determinations that (1) trucking companies commonly bear the risk of loss and that

(2) the agreement between SSV and [[          ]] contained no insurance contract.  Alternatively,

Commerce has the discretion to reclassify the contract provision.

### III.    The Court Remands for Commerce to Reconsider its Selection of Financial Statements.

In the *Final Determination*, Commerce used the financial statements of a single company,

Welspun Corporation Limited ("Welspun"), to calculate financial ratios.  I&D Mem. 19–20.  In

their motions for judgment on the agency record, U.S. Steel and SSV both argued that

Commerce should use additional companies.  SSV Br. 33–46; U.S. Steel Br. 33–37.  After all

briefing and oral argument before this court, SSV filed a motion for leave to submit

supplemental information.  SSV Mot. for Leave, ECF No. 104.  The supplemental information

conflicts with Commerce's explanation for choosing Welspun over other proposed companies.

In response, the Government requested a voluntary remand, Def.'s Resp. to SSV Mot. for Leave,

ECF No. 105, and this court granted SSV leave to submit supplemental information, ECF No.

106.[7]  The court now grants the request for a voluntary remand.

### A.  Background

"When Commerce is constructing the normal value for a respondent in a [NME] country,

Commerce must also take into account those costs that are not covered by the factors of

production (the physical inputs and the wages of the workers directly involved in the

manufacturing process.)" *Mittal Steel Galati S.A. v. United States*, 31 CIT 1121, 1137, 503 F.

Supp. 2d 1295, 1310 (2007); s*ee also* 19 U.S.C. § 1677b(c)(1).  In other words, "[b]ecause firms

have 'general expenses and profits' not traceable to a specific product, in order to capture these

expenses and profits, Commerce must factor [into the normal value calculation] (1) factory

overhead ('overhead'), (2) selling, general and administrative expenses ('SG&A'), and (3)

profit." *Mittal Steel*, 31 CIT at 1137-38, 503 F. Supp. 2d at 1310 (citation omitted).  To calculate

and incorporate these costs, "Commerce relies upon financial statements from one or more

[surrogate] companies based in the primary surrogate country." *Id.*

In its *Preliminary Determination*, Commerce used the financial statements of three

companies to calculate the financial ratios: APL Apollo Tubes Ltd., Bhushan Steel Ltd., and

Welspun.  Surrogate Values Mem. for Prelim. Determ. 7, PD 151 (Feb. 13, 2014), ECF No. 73-1.

In the *Final Determination*, Commerce used only the financial statements of Welspun.   I&D

Mem. 19–20.

---

[7] Defendant-Intervenors filed no response to SSV's motion.

In their respective motions for judgement on the agency record, both U.S. Steel and SSV argued that Commerce erred in using exclusively the financial statements of Welspun.  U.S. Steel insisted that Commerce should have used the financial statements of four additional companies.  U.S. Steel Br. 33–37.  Commerce explained that it rejected two of the suggested companies because the companies received countervailable subsidies.  I&D Mem. 18–19.  It rejected the other two because they were integrated at levels different from SSV.  *Id.*  In like manner, SSV argued that Commerce erred in rejecting the financial statements of six proposed nonintegrated Indian companies.  SSV Br. 33–46.  Commerce rejected these companies, and chose to rely on only Welspun, because Welspun produced identical merchandise (OCTG) and the rejected companies produced merely comparable merchandise.  I&D Mem. 17–18.

After the parties submitted briefs and participated in oral argument, SSV submitted a motion to file supplemental information showing that Commerce's explanation may be false.  SSV Mot. for Leave, ECF No. 104.  The supplemental information is the remand redetermination of the investigation of OCTG from the Republic of Korea.  *Id.* at 2–3 (citing Remand Redetermination at 19, 56, *Husteel Co. v. United States*, Slip Op. 16-76, 2016 WL 4091162 (Feb. 22, 2016) (No. 14-00215), ECF No. 240-1.  In that remand redetermination, Commerce refused to accept the financial statements of Welspun because Commerce found that "Welspun is not an OCTG producer."  *Id.* at 56.  Yet, as explained above, Commerce chose Welspun here precisely because it found that Welspun produced OCTG.  I&D Mem. 19.  The two findings are irreconcilable. Admitting no error, the Government requests a remand to fix potential problems.

## B.  Discussion

Without admitting any error, the Government "may request a remand . . . in order to reconsider its previous opinion."  *SKF USA*, 254 F.3d at 1029.  The Government may "simply

state that it ha[s] doubts about the correctness of its decision." *Id*. When the Government

requests a remand, admits no error, and provides little explanation for its request, "the reviewing

court has discretion over whether to remand." *Id*. And "if the agency's concern is substantial

and legitimate, a remand is usually appropriate." *Id*. That said, if the Government's request for

a remand "is frivolous or in bad faith," the court may deny the remand. *Id*.; *see also Albemarle*

*Corp. v. United States*, 37 CIT __, __, 931 F. Supp. 2d. 1280, 1290 (2013) (explaining that a

voluntary remand provides enhanced efficiency by ensuring that only one Commerce decision

comes before the court).

 The court finds no evidence of bad faith or frivolousness in the Government's request for a

remand. To the contrary, there are substantial and legitimate grounds for a remand. Commerce

predicated its selection of the financial statements of Welspun on the express finding that

Welspun, unlike other proposed companies, produces OCTG. I&D Mem. 19. But Commerce

appears to be confused, because it has also found that, in fact, Welspun produces no OCTG.

Remand Redetermination at 56, *Husteel*, 2016 WL 4091162 (No. 14-00215). Given these

inconsistent findings—and the importance of these findings for selecting the appropriate

financial statements—the Government properly requested "a voluntary remand so that

[Commerce] may reconsider its selection of financial statements for calculating the surrogate

financial ratios." Def.'s Resp. to SSV Mot. for Leave 1, ECF No. 105. The court grants the

remand request.

**IV. The Court Remands for a Reconsideration of SSV's Yield Loss.**

 SSV challenges Commerce's calculation of yield loss, U.S. Steel argues that Commerce

properly calculated yield loss, and the Government requests a remand to reconsider yield loss.

The court grants the Government's request for a remand.

## A.  Background

In its *Final Determination*, Commerce adjusted the normal value of OCTG to account for yield loss.  I&D Mem. 38.  Documents obtained during verification formed the basis for the yield loss calculation.  Sales Verification Report 11–12, CD 169 (May 30, 2014), ECF No. 58.  These documents showed that before the period of investigation, SSV's U.S. affiliate rejected as defective [[                    ]] percent of SSV's shipment of upgradeable OCTG (OCTG made with J55 coil containing elevated carbon levels).  Final Analysis Mem. 1–2, CD 182 (July 10, 2014), ECF No. 73-3.  From this information, Commerce increased SSV's usage rate of inputs by [[      ]] percent.  *Id.*

## B.  Discussion

SSV challenges the yield loss calculation on four grounds.  First, SSV argues that a [[      ]] percent yield loss was inaccurate because Commerce calculated this loss using exclusively transactions of upgradeable OCTG exported before the period of investigation rather than all transactions of OCTG.  SSV Br. 47–48.  Second, SSV contends that the defects in the OCTG "must have occurred during transit, and not during manufacture." *Id.* at 49.  Accordingly, SSV insists that any yield loss was inappropriate because transportation insurance proceeds would have covered SSV's losses on the rejected OCTG if such losses existed.  *Id.*  Third, SSV asserts that the [[      ]] percent yield loss was improper because Commerce did not offset this loss with the value of the rejected OCTG sold as scrap.  *Id.* at 50.  Fourth, SSV argues that adjusting "normal value for losses experienced during transit from Vietnam to the United States was also contrary to the statute." *Id*. at 50–51 (emphasis omitted).

For its part, the Government requests a voluntary remand to reconsider its calculation of yield loss.  Def.'s Resp. to Pl.'s and Def.-Intervenor's Mots. for J. on Agency R. 46, ECF No. 65

("Gov't Resp.").[8]  Again, the Government may request a remand for reconsideration without admitting error.  *SKF USA*, 254 F.3d at 1029.  Rather than listing specific grounds for the remand, the Government may "simply state that it ha[s] doubts about the correctness of its decision."  *Id.*

Here, the Government fails to explain the reason for its remand request.  But there is no evidence that the request "is frivolous or in bad faith."  *Id.*  And there are "substantial and legitimate" grounds for granting the remand.  *Id.*  Commerce's explanation does not provide a satisfactory rebuttal to SSV's arguments.  For example, in response to SSV's argument that yield loss should be offset with scrap sales, Commerce stated—with no citation to authority—that "yield loss can occur regardless of whether any of it is sold as scrap."  I&D Mem. 38.  Likewise, Commerce asserted without citation that midtransit yield loss still counts because "[y]ield loss can occur when the semi-finished product is shipped to or further processed by a further processor."  *Id.*  Commerce's sparse and unsubstantiated explanation would not likely weather this court's review under the substantial-evidence standard.  Therefore, the court grants the Government's request for a voluntary remand to reconsider its yield loss calculation.  *See generally SeAH Steel Corp. v. United States*, 34 CIT 605, 637, 704 F. Supp. 2d 1353, 1379 (2010) (finding that although, as here, "Defendant-Intervenor urges the Court to affirm Commerce's decision . . . , the Court cannot overlook the fact that Commerce itself has called into question an aspect of the *Final Results*"); *Albemarle Corp.*, 37 CIT at __, 931 F. Supp. 2d at

---

[8] The Government nonetheless opposes three of SSV's four arguments challenging the yield loss calculation.  The Government states that SSV included nothing in its case brief or rebuttal case brief to Commerce regarding SSV's current arguments that (1) insurance covered all losses from the rejected OCTG and that (2) Commerce erred in failing to offset the yield loss by the scrap value of the rejected OCTG. Gov't Br. 47. Consequently, the Government argues that "SSV therefore failed to exhaust its administrative remedies."  *Id.* Further, the Government explains that "SSV is incorrect in claiming that Commerce may not make any yield loss adjustment to normal value for merchandise" damaged after the packing stage. *Id.* at 46.

1290 (explaining that a voluntary remand enhances efficiency by ensuring that only one

Commerce decision comes before the court).[9]  On remand, Commerce must provide a detailed

explanation of its conclusions, with citations to record evidence and legal authority.

**V.      The Court Remands for Commerce to Reconsider the Inclusion of "Document Preparation" Costs in the Calculation of SSV's Brokerage and Handling Costs for Exports of OCTG.**

SSV argues that Commerce acted in violation of the law and without the support of

substantial evidence when it included "document preparation" costs in the calculation of SSV's

brokerage and handling ("B&H") costs on exports of OCTG.  SSV contends that it never used

document preparation services and, therefore, Commerce had no reason to value and include

these services within B&H.  SSV Br. 11–16.[10]  Both U.S. Steel and the Government argue that,

under Commerce's established practice, SSV is ineligible for an adjustment to its B&H surrogate

value.  The court remands for further explanation or, alternatively, recalculation.

**A.  Background**

In shipping goods from Vietnam to the United States, SSV incurred B&H expenses.  C Resp.

28, CD 22 (Oct. 30, 2013), ECF No. 73-3.  To determine a surrogate value for the B&H services,

Commerce used the World Bank's report "Doing Business India: 2014" ("Doing Business

report").  I&D Mem. 6–7.  This report provides a total cost for B&H services, and also breaks

down this total cost into four subcategories:  "[c]ustoms clearance and technical control" costs,

---

[9] A remand is appropriate despite U.S. Steel's opposition.

[10] SSV also complains about Commerce's decision to use the World Bank's Doing Business India: 2014 report to calculate surrogate values for B&H services.  SSV Br. 12.  According to SSV, the report "was not intended as a measure of the actual brokerage and handling services for exports of steel products like OCTG"; rather, "it was part of a comparative analysis prepared by the World Bank's staff to benchmark the costs of a wide range of business activities in various countries around the world."  SSV Br. 12.  But SSV never argues that Commerce's use of the report lacked the support of substantial evidence or that it was not in accordance with the law.  SSV's grievance is not a full-fledged challenge to Commerce's decision and this court does not address its merit.

"[p]orts and terminal handling" costs, "[i]nland transportation and handling" costs, and

"[d]ocuments preparation" costs.  Surrogate Value Sources Ex. IV, PD 164 (Feb. 21, 2014), ECF

No. 73-2.  The report lists the following nine documents under the category of "document

preparation": (1) bill of lading, (2) certificate of origin, (3) commercial invoice, (4) foreign

exchange control form, (5) inspection report, (6) packing list, (7) shipping bill (customs export

declaration), (8) technical standard certificate, and (9) terminal handling receipts.  *Id.*  However,

the report does not provide individual costs for these documents.  *Id.*

Commerce included three of the Doing Business report's subcategorized costs in the

calculation of SSV's B&H costs: "document preparation," "customs clearance and technical

control," and "ports and terminal handling."  *See* Surrogate Values Mem. Ex. 9, PD 152 (Feb.

20, 2014), ECF No. 73-2.  SSV contends that it did not incur any "document preparation" costs.

SSV Br. 11.  On that basis, SSV concludes that Commerce should adjust the B&H surrogate

value by excluding the "document preparation" costs.  *Id.* at 16.

In the *Final Determination*, Commerce stated the established practice governing its decision

to adjust B&H surrogate values:

> [Commerce] will sometimes make an adjustment to surrogate value data to reflect an
> individual exporter's experience, including to B&H surrogate value data, but normally
> only when the item's amount is clearly identified in the 'Doing Business' report and
> the factors of production for self-preparation are accounted for.

I&D Mem. 7 (footnote omitted).  No party disputes the relevance or validity of this practice.

Consequently, to qualify for an adjustment to its B&H values, SSV must satisfy two conditions.

First, the Doing Business report must clearly identify the cost for the documents that SSV claims

that it prepared without a broker.  Commerce concluded that the Doing Business report did not

provide the requisite costs.  *Id.*  Second, Commerce must have otherwise accounted for the

factors of production for any self-preparation of documents.  Commerce never addressed the

second condition.  The court finds that substantial evidence does not currently support

Commerce's finding that SSV failed to satisfy the first condition, and it is unclear whether SSV

satisfies the second condition.  Thus, the court remands.

**B. Discussion**

To prove satisfaction of the first condition above, SSV enumerates all nine documents within

the category of "document preparation" and shows the source of each document.  (Again, the

nine documents are (1) certificate of origin; (2) foreign exchange control form; (3) terminal

handling receipts; (4) bill of lading; (5) commercial invoice; (6) inspection report; (7) packing

list; (8) shipping bill (customs export declaration); and (9) technical standard certificate.  SSV

Case Br. Attach. 2, PD 197 (June 6, 2014), ECF No. 58.)  According to a chart that counsel for

SSV prepared in response to verification requests, SSV's broker prepared none of these

documents.  SSV Verification Ex. 5, CD 84 (Apr. 14, 2014), ECF No. 58.  The chart claims that

nobody prepared documents (1) through (3) because these documents were unnecessary for

shipment of OCTG.  *Id.*  The ocean shipping company covered document (4).  *Id.*  And SSV

itself prepared documents (5) through (9).  *Id.*  Although the Doing Business report lists no

individual costs for any of the foregoing documents, the report lists a total cost for document

preparation services, and the nine foregoing documents comprise this total cost.  Surrogate Value

Sources Ex. IV, PD 164 (Feb. 21, 2014), ECF No. 73-2.  Put differently, the total cost of the

documents that SSV claims its broker did not prepare (whether because the documents were

prepared by SSV, a third party, or no one at all) is listed in the report.  Accordingly, SSV argues

that, because its broker prepared none of the nine documents, the "item's amount"—the amount

for the services that SSV did not receive from a broker, which here includes all the documents—

is "clearly identified in the Doing Business report."  SSV Br. 14 (quoting I&D Mem. 7).  As a

result, SSV maintains that it satisfied the first of two conditions of Commerce's practice.

In the *Final Determination*, Commerce disagreed.  It concluded that "the cost for each item"

that "SSV has identified" was "not indicated in the 'Doing Business' report."  I&D Mem. 7.  But

Commerce referenced no record evidence, and consequently never accounted for the evidence

that SSV provided.  *Id.*  On its face, SSV's evidence appears to indicate that the broker prepared

none of the nine documents, in which case the Doing Business report indicated "the cost for each

item" that "SSV has identified."  The report indicated a cost for the items because the report

listed the total aggregated cost for document preparation services, and this total aggregated cost

incorporated exclusively the documents that SSV either did not prepare or prepared without a

broker.  Surrogate Value Sources Ex. IV.  In other words, SSV's evidence suggests that SSV

satisfied the first condition—yet Commerce ignored this evidence, and cited no alternative

evidence, in reaching the opposite conclusion.  "Commerce's total failure to consider or discuss

record evidence which, on its face, provides significant support for an alternative conclusion

renders [Commerce's] determination unsupported by substantial evidence."  *Allegheny Ludlum

Corp. v. United States*, 24 CIT 452, 479, 112 F. Supp. 2d 1141, 1165 (2000).[11]

U.S. Steel attempts to explain Commerce's finding that the Doing Business report did not

satisfy the first condition because it did not indicate the document preparation costs.  U.S. Steel

maintains that SSV's broker "did, in fact, prepare documents that were necessary to export

---

[11] U.S. Steel cites a list of cases in which this court "previously rejected respondents' claims that the calculation of their B&H expenses should be adjusted based on the fact that they self-prepare one or more of the documents listed in the World Bank's Doing Business reports."  Def.-Intervenor's Resp. to Pl.'s Mot. for J. on Agency R. 15, ECF. No. 64 (alteration omitted) (citing *DuPont Teijin Films China Ltd. v. United States*, 38 CIT _, _, 7 F. Supp. 3d 1338, 1350 (2014); *Since Hardware (Guangzhou) Co. v. United States*, 37 CIT _, _, 911 F. Supp. 2d 1362, 1378 (2013); *Dongguan Sunrise Furniture Co. v. United States*, 36 CIT _, _, 865 F. Supp. 2d 1216, 1247 (2012). But these cases are inapplicable.  In the cases U.S. Steel cites, unlike here, the respondents did not allege that the broker prepared none of the documents listed under "document preparation."  Therefore, the Doing Business report did not provide the total aggregate cost for document preparation, as it does here.

OCTG to the United States [[                                                    ]].” Def.-Intervenor's Resp. to

Pl.'s Mot. for J. on Agency R. 12, ECF. No. 64 ("U.S. Steel Resp.").  As evidence, U.S. Steel

cites a contract between SSV and its freight forwarding company, [[        ]], in which [[


                                        ]] Suppl. A&C Resp. app. SC-5, CD 31–35 (Jan 9,

2014), ECF No. 60.  The contract specifies that the fees for [[


                    ]] *Id.*  U.S. Steel concludes that this contract proves that SSV's broker

prepared documents.  And because the Doing Business report lists only a total cost for all nine

documents, and not a separate cost for each particular document, the Doing Business report does

not clearly identify the amount for the documents that SSV prepared without a broker.  From

this, U.S. Steel concludes that substantial evidence supported Commerce's conclusion that SSV

failed to satisfy the first condition necessary for adjusting B&H surrogate values.  U.S. Steel

Resp. 10–17.

      But even if U.S. Steel offers a plausible explanation for Commerce's finding, Commerce did

not.  The court cannot rely on U.S. Steel's "post hoc rationalizations" for Commerce's decision.

*Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962).  Commerce itself must

explain the basis for declining to adjust the B&H surrogate value to reflect the absence or

presence of "document preparation" costs.  If Commerce continues to conclude that the Doing

Business report failed to list the cost of the items for which SSV incurred no broker-preparation

costs, Commerce must reconcile this conclusion with the evidence that SSV produced.

*Allegheny*, 24 CIT at 479, 112 F. Supp. 2d at 1165.  In addition, Commerce has the discretion to

consider whether SSV satisfied the second condition necessary for a B&H adjustment.[12]

---

[12] As explained above, to prove that Commerce's practice requires adjusting the B&H surrogate value, two conditions must exist: (1) the Doing Business report must clearly identify the allegedly unincurred document-

However Commerce proceeds, the agency must recalculate SSV's B&H value if its analysis

warrants that result.

**VI.     The Court Remands for Commerce to Reconsider its Decision to Add B&H
         Costs to SSV's ME Purchase Price for HRC Imports.**

SSV argues that Commerce improperly added the costs of B&H services on imports of the

HRC input.  SSV offers three reasons that adding B&H costs to these imports allegedly lacked

the support of substantial record evidence and contravened the law.  First, SSV argues that there

is no evidence that SSV incurred B&H costs on imports of HRC.  SSV Br. 16–17.  Second, SSV

states that, "even if a Vietnamese customs broker had assisted SSV in connection with customs

clearance on imports of [HRC], there is no reason to believe that SSV [obtained the other

services] described in the Doing Business report."  SSV Br. 18.  Third, even if SSV incurred

known B&H services, Commerce's practice prohibits adding the cost of B&H services to the

cost of input imports.  SSV Br. 21–22.

**A.  Background**

19 U.S.C. § 1677b(c)(1) mandates that, when calculating the normal value, Commerce must

determine the value of the factors of production used to produce subject merchandise.  To do so,

Commerce determined the cost for imports of HRC, an input in SSV's OCTG.  To fully account

for the cost of acquiring HRC, Commerce added to the purchase price of HRC the B&H costs

---

preparation costs and (2) Commerce must separately account for the factors of production for these documents.
I&D Mem. 7 (footnote omitted).  Commerce never discussed the second condition.  The court, therefore, cannot
consider it in weighing the substantiality of Commerce's reasoning.  *Burlington*, 371 U.S. at 168–69.  SSV argued
that Commerce accounted for the self-preparation of the documents because it "captured [the cost of these
documents] in the surrogate values for overhead and SG&A expenses."  SSV Br. 15.  SSV offered no evidence that
Welspun—the surrogate company whose financial statements Commerce used to calculate financial ratios—
prepared its own documents.  Therefore, it seems unlikely that SSV satisfied the second condition necessary for an
adjustment.  Regardless, Commerce requested and this court granted a remand to reconsider Commerce's selection
of financial statements.  As a result, the court does not know which company Commerce will use for financial
statements.  And so it is currently impossible to ascertain whether Commerce accounted for the cost of self-
preparation of B&H documents in its overhead and SG&A calculations.  It is therefore impossible to know at this
stage whether the second condition counsels for or against a B&H surrogate value adjustment.

that SSV incurred for importing the HRC.  Commerce again relied on the Doing Business report

to calculate the value of the B&H services.  I&D Mem. 40.  As with B&H costs pertaining to

exports, the Doing Business report provides a total B&H cost as well as subcategorized costs for

"[d]ocuments preparation," "[c]ustoms clearance and technical control, "[p]orts and terminal

handling," and "[i]nland transportation and handling."  Surrogate Value Sources Ex. IV, PD 164

(Fed. 21, 2014), ECF No. 73-2.  Commerce used the costs of three of the four subcategories to

calculate SSV's B&H cost on imports of HRC: (1) "documents preparation," (2) "customs

clearance and technical control," and (3) "ports and terminal handling."  Final Analysis Mem.

Attach. 2, PD 217 (July 16, 2014), ECF No. 58.

### B.  The Court Sustains Commerce's Finding that SSV Incurred B&H Costs.

First, SSV argues that "there is no evidence on the record that SSV used the services of a

customs broker in connection with imports of [HRC]."  SSV Br. 16 (emphasis omitted).  From

this, SSV concludes that Commerce erred in adding B&H costs to imports of HRC.  SSV Br. 17.

The court finds that SSV failed to exhaust its administrative remedies on this issue.

Before the *Preliminary Determination*, U.S. Steel argued that Commerce should add B&H

fees to SSV's imports of HRC.  U.S. Steel Pre-prelim. Cmts. 12–14, CD 53 (Feb. 3, 2014), ECF

No. 73-3.  SSV failed to argue that it incurred no B&H expenses.  Instead, it argued that the

financial ratios for overhead capture B&H expenses.  SSV Pre-prelim Cmts. 9, PD 144 (Feb. 7,

2014), ECF No. 73-1.  The *Preliminary Determination* included no B&H costs for imports of

HRC.  Prelim. Decision Mem., PD 245 (Oct. 23, 2014), ECF No. 73-2.  Later, U.S. Steel again

insisted that Commerce add B&H costs for HRC imports because it is "clear that [SSV] incurred

brokerage and handling and port fees associated with its [ME] purchases of [HRC]."  U.S. Steel

Case Br. 34, PD 203 (June 9, 2014), ECF No. 73-2.  U.S. Steel explained that SSV "does not

dispute as a factual matter that it incurs brokerage and handling and port fees on its imports of

[HRC]." *Id.* at 35.  In response, SSV again failed to argue that it incurred no B&H costs from a

customs broker.  Rather, SSV argued (1) that U.S. Steel provided no "evidence to support their

claim that the import charges were not already included in the overhead figures calculated by

[Commerce]" and (2) that "the import brokerage-and-handling charges proposed by [U.S. Steel]

[were] plainly excessive."  SSV Rebuttal Br. 35, PD 207 (June 13, 2014), ECF No. 73-2.  In its

*Final Determination*, Commerce stated that "SSV does not dispute" that it had B&H costs.  I&D

Mem. 40.  Now, SSV disputes that it had B&H costs.

This court "shall, where appropriate, require the exhaustion of administrative remedies."  28

U.S.C. § 2637(d).  The court has "generally taken a strict view of the need for parties to exhaust

their remedies by raising all arguments in a timely fashion so that they may be appropriately

addressed by the agency."  *Nakornthai Strip Mill Public Co. v. United States*, 32 CIT 553, 564,

558 F. Supp. 2d 1319, 1329 (2008) (citation omitted).  The doctrine of exhaustion "allows the

administrative agency to perform the functions within its area of special competence (to develop

the factual record and to apply its expertise), and—at the same time—it promotes judicial

efficiency and conserves judicial resources."  *Ta Chen Stainless Steel Pipe, Ltd. v. United States*,

28 CIT 627, 644, 342 F. Supp. 2d 1191, 1206 (2004); *see also Richey v. United States*, 322 F.3d

1317, 1326 (Fed. Cir. 2003).  "Simple fairness to those who are engaged in the tasks of

administration, and to litigants, requires as a general rule that courts should not topple over

administrative decisions unless the administrative body not only has erred but has erred against

objection made at the time appropriate under its practice."  *United States v. L.A. Tucker Truck*

*Lines, Inc.*, 344 U.S. 33, 37 (1952).  In this case, SSV never argued before Commerce that SSV

did not incur B&H costs.  As a result, SSV failed to exhaust this argument.

SSV cites *Qingdao Taifa Group Co. v. United States*, 33 CIT 1090, 1093, 637 F. Supp. 2d

1231, 1236 (2009) for the proposition that

> [a] party . . . may seek judicial review of an issue that it did not raise in a case brief
> if Commerce did not address the issue until its final decision, because in such a
> circumstance the party would not have had a full and fair opportunity to raise the
> issue at the administrative level.

SSV Reply Br. 9 n.15.  But the rationale driving *Qingdao* is inapplicable in this case.  Although

Commerce did not decide that SSV incurred B&H costs until the *Final Determination*, U.S. Steel

lobbied for such a conclusion both before and after the *Preliminary Determination*.  U.S. Steel

Case Br. 34–35.  Though SSV had no obligation to respond to these arguments, it chose to

respond.  In response, SSV could have argued, as it did here, that there is no evidence that it used

B&H services on its imports of HRC.  It did not.  Instead, SSV responded that Commerce need

not add B&H expenses because the financial ratio for overhead captures this expense—an

argument that presupposes the existence of B&H expenses.  SSV Rebuttal Br. 35.  In addition,

SSV argued that the B&H costs that U.S. Steel requested were "plainly excessive"—another

argument that seems to presuppose the existence of B&H expenses.  *Id.*  In other words, SSV

failed to advance an argument about the existence of B&H costs—and implicitly admitted the

existence of these costs—at a time when SSV was intentionally discussing the appropriate

handling of B&H costs.[13]  And U.S. Steel even relied on SSV's implicit acknowledgment of

B&H costs in fashioning its argument about how to account for them:  U.S. Steel noted that SSV

did not "dispute as a factual matter that it" incurred B&H expenses.  U.S. Steel Case Br. 34–35.

Because SSV responded to U.S. Steel's argument, SSV could have argued that it incurred no

---

[13] In fact, SSV may have explicitly recognized the use of B&H services from brokers on imports of HRC
when it stated: "[T]he 'Doing Business' report figures proposed by [U.S. Steel] do not provide a reasonable basis for
ascertaining the value of the *brokerage-and-handling services [that SSV] obtained from its customs broker on
[HRC] imports during the investigation period.*"  SSV Rebuttal Br. 41 (emphasis added).

B&H costs.  Put differently, SSV had a "full and fair opportunity to raise the issue at the

administrative level."  The rule in *Qingdao* is inapplicable here, where SSV's arguments and

representations—and not SSV's mere silence—led others to reasonably conclude that SSV

incurred B&H costs from a broker on imports of HRC.

In addition, requiring exhaustion here furthers the values behind the doctrine by (1) avoiding

judicial inefficiency and (2) allowing Commerce to more thoroughly develop a relevant factual

record and apply its expertise.  *Ta Chen*, 28 CIT at 644, 342 F. Supp. 2d at 1206.  For the

foregoing reasons, SSV failed to exhaust its administrative remedies on this issue.  Moreover, no

exhaustion exceptions apply here because (1) this is not a pure question of law, (2) there was no

lack of access to the confidential record, (3) there is no intervening legal decision, and (4) it

would not have been futile to raise this issue at the administrative level.  *See Gerber Food

(Yunnan) Co. v. United States*, 33 CIT 186, 193, 601 F. Supp. 2d 1370, 1377 (2009) (listing

exhaustion exceptions).  Accordingly, the court does not now allow SSV to argue for the first

time that it incurred no B&H costs.  *See* 28 U.S.C. § 2637(d).[14]

---

[14] Notwithstanding this conclusion, even if this court considered SSV's challenge, substantial record evidence would likely support Commerce's conclusion that SSV incurred B&H expenses from a broker on imports of HRC.  SSV's purchasing agent stated at verification that "[w]hen he receives all the documents he starts the customs clearance."  SSV Verification Report 25, PD 191 (May 7, 2014), ECF No. 58.  Additionally, the agreement between SSV and its freight forwarder for imports of raw materials, [[          ]] confirms that SSV obtained B&H services.  SSV Resp. to Suppl. Sec. C&D Questionnaire app. SSD-5, CD 54–56 (Feb. 5, 2014), ECF No. 72.  The contract stated that [[                                                                         ]] *Id.*  [[

                       ]] *Id.*  The contract simply required [[
                                                                    ]] *Id.*  The contract also stated that the price includes the following fees and services: [[
                                        ]]  *Id.*  This record evidence substantiates Commerce's finding that SSV contracted to receive B&H services from a broker on imports of HRC.  It also evidences receipt of the three categories of B&H costs that Commerce included in its calculation: "document preparation," "ports and terminal handling," and "customs clearance and technical control."

### C. The Court Remands for Commerce to Explain How its Conclusion that Financial Statements do not Account for B&H Costs Changes Following the Potential Reselection of Financial Statements.

SSV contends that, "even if a Vietnamese customs broker had assisted SSV in connection with customs clearance on imports of [HRC], there is no reason to believe that SSV" obtained services for "document preparation" and "ports and terminal handling."  SSV Br. 18.  Thus, SSV maintains that Commerce improperly included the Doing Business report costs for these two services.  *Id*. at 18–19.

SSV first asserts that "[t]here was no evidence that SSV employed a customs broker to prepare any of the . . . documents that were included in the Doing Business [r]eport's" "document preparation" category.  *Id.* at 19.  On the import side, the "document preparation" category includes eleven documents.  Surrogate Value Sources Ex. IV, PD 164 (Fed. 21, 2014), ECF No. 73-2.  In footnotes in its Rebuttal Brief before Commerce, SSV cited record evidence to show that SSV personnel and the suppliers of HRC prepared nine of the eleven documents.  SSV Rebuttal Br. 38–40 n.60–66, PD 207 (June 13, 2014), ECF No. 58.[15]  The record citations appear to demonstrate that SSV used no broker for nine of the eleven documents in the "document preparation" category.  *Id.*[16]  SSV next asserts that "there was no evidence that a customs broker provided port or terminal handling services."  SSV Br. 20.  SSV explains that it incurred such services "only for shipments made in containers," and asserts it did not ship OCTG in containers.

---

[15] SSV regularly and inconveniently excludes relevant record citations (and citations to proceedings) from its brief before this court.  This requires the court to peruse the footnotes of SSV's briefing at the administrative level so that the court can locate the citations relevant to SSV's arguments before this court.  In the future, SSV may instead choose to directly cite record evidence and proceedings, not SSV's own prior statements discussing record evidence and proceedings.

[16] The Doing Business report lists only a single cost for all documents.  Surrogate Value Sources Ex. IV.  It does not provide costs for any individual documents.  Thus, the Doing Business report identifies no costs for the specific documents that SSV and the suppliers prepared.

*Id.*  In support of this last point, SSV cites no record evidence.  *Id.*

For its part, Commerce explained that it added "B&H and import fees to the [ME] purchase price of [HRC] because the record indicates that SSV incurred cost[s] for B&H and SSV does not dispute this cost."  I&D Mem. 40.  Commerce then concluded that "SSV has presented no evidence that the B&H costs are included in the overhead reported on any of the financial statements on the record."  *Id.*

From this, it appears that Commerce used the same established practice that it used in Issue V above.  *See* Gov't Resp. 40.  As applied here, the practice dictates that Commerce must adjust the (import-side) B&H value if two conditions exist.[17]  First, the Doing Business report must clearly identify the cost for the services that SSV claims that it and its suppliers provided.  Second, Commerce must have otherwise accounted for the cost of the services provided.  *See* I&D Mem. 7 (footnote omitted).  Commerce never addressed the first condition in its explanation, but it addressed the second condition by explaining that no evidence exists concerning whether the financial ratios otherwise accounted for the B&H costs of imports.  I&D Mem. 40.  If true, both conditions are not satisfied and Commerce properly refused to adjust the B&H calculation.  Nevertheless, the Government requested and this court granted a remand to Commerce to reconsider its selection of financial statements.  For that reason, Commerce's explanation here may no longer apply because, if the financial statements change on remand, the new financial statements may account for SSV's B&H costs on its imports of HRC.  On that basis, the court remands for Commerce to explain how its findings change, or do not change, based on its selection of financial statements.  The court also orders Commerce to provide a more thorough explanation of its reasoning.

---

[17] The court, however, is not certain that Commerce used this established practice.  Consequently, Commerce must explain its reasoning more fully on remand.

### D. The Court Remands for Commerce to Consider if an Applicable Agency Practice Precludes Commerce from Adding Costs for B&H Services to SSV's ME Purchase Price for HRC.

Third, SSV argues that "the inclusion of import brokerage costs in the calculation of the cost of imported [HRC] is [inconsistent] with Commerce's practice." SSV Br. 21. SSV cites two proceedings where Commerce declined to calculate and apply surrogate values for the B&H services used to import inputs. SSV Br. 21 n.24 (citing *Fresh Garlic from the People's Republic of China*, 79 Fed. Reg. 36,721 (Dep't Commerce June 30, 2014) (final admin. review) and accompanying I&D Mem. ("*Fresh Garlic*") at cmt 7; *Prestressed Concrete Steel Rail Tie Wire from the People's Republic of China*, 79 Fed. Reg. 25,572 (Dep't Commerce May 5, 2014) (final determ.) and accompanying I&D Mem. ("*Prestressed Concrete*") at cmt. 3). SSV argues that these two proceedings establish that, in adding costs for B&H services to the ME purchase price of HRC, Commerce departed from its established practice without explanation. SSV Br. 21–22. If SSV is correct, Commerce acted arbitrarily and in violation of the law.

But Commerce provided no response to this argument because SSV never raised it at the administrative level. As chronicled above, U.S. Steel argued both before and after the *Preliminary Determination* that Commerce should add the cost of B&H services to the ME purchase price of imports of HRC. U.S. Steel Pre-prelim. Cmts. 12–14, CD 53 (Feb. 3, 2014), ECF No. 73-3; U.S. Steel Case Br. 34–35, PD 203 (June 9, 2014), ECF No. 73-2. Though not required to respond, SSV responded, and it argued (1) that the overhead financial ratios captured the cost of B&H services on imports of inputs and (2) that U.S. Steel inflated the value of these B&H services. SSV Rebuttal Br. 35, PD 207 (June 13, 2014), ECF No. 73-2. SSV failed to mention its current argument.

However, an exception to exhaustion doctrine prevents the court from barring SSV's current argument.  Commerce issued *Prestressed Concrete* on May 5, 2014.  Shortly thereafter, on June 13, 2014, SSV submitted its rebuttal brief.  *Id.*  On June 30, 2014, Commerce issued *Fresh Garlic*.  Therefore, at the time SSV submitted its rebuttal brief, SSV may have lacked the information necessary to argue that an applicable established practice exists.  On that basis, the court excuses SSV from its failure to exhaust this argument.  *See Gerber Food*, 33 CIT at 193, 601 F. Supp. 2d at 1381 (explaining that the court has discretion to deem the exhaustion doctrine inapplicable when there is an intervening legal decision or it would have been futile to raise the argument at the administrative level).  Further, although U.S. Steel and the Government offer potentially legitimate explanations as to why no practice precludes the adding of B&H costs here, the court "may not accept . . . counsel's post hoc rationalizations for agency action." *Burlington Truck Lines*, 371 U.S. at 168.[18]  Instead, "a reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency." *Chenery*, 332 U.S. at 196.  Because there is, understandably, no explanation from Commerce, the appropriate result is a remand to allow Commerce to apply its expertise.

On remand, Commerce must determine and explain whether a relevant established practice exists.  An established practice exists "when a uniform and established procedure exists that

---

[18] U.S. Steel states that "[i]n NME cases where respondents have incurred B&H expenses on their imports of market economy inputs, Commerce has [previously] increased the market economy prices by such fees."  U.S. Steel Resp. 17.  Additionally, U.S. Steel explains that this court previously held that "two prior determinations . . . are not enough to constitute an agency practice that is binding on Commerce." *Id.* at 21 (quoting *Shandong Huarong Mach. Co., Ltd. v. United States*, 30 CIT 1269, 1293, 435 F. Supp. 2d 1261, 1282 n.23 (2006)).  Thus, U.S. Steel argues that the two proceedings SSV cites are insufficient proof of an established practice.  *Id.*  Further, U.S. Steel insists that, even if the two proceedings create an established practice, the practice is inapplicable here.  *Id.* at 22.  It is evidently inapplicable because the practice relates to situations where Commerce adds a surrogate B&H value to a surrogate value for imports of inputs.  In contrast, here Commerce added a surrogate B&H value to the market economy purchase price of an imported input.  *Id.*

would lead a party, in the absence of notification of change, reasonably to expect adherence to

the [particular action] or procedure." *Huvis*, 31 CIT at 1811, 525 F. Supp. 2d at 1378 (alteration

in original) (citation omitted).  If an established practice is applicable to Commerce's decision to

add B&H costs to the ME purchase price of HRC, Commerce must either (1) explain the reasons

for departing from the practice or (2) revise its decision.

**VII.  The Court Remands for Further Explanation of Commerce's Allocation of B&H**
      **Costs.**

SSV argues that "Commerce's allocation of the 'Doing Business report' costs was illogical,

contrary to this court's precedent, and unsupported by the evidence on the record."  SSV Br. 23.

The court remands for further explanation.

**A.  Background**

As discussed, Commerce used the Doing Business report to calculate surrogate values for

B&H services on both exports of OCTG and imports of HRC.  I&D Mem. 6–7, 40.  The figures

from the report assumed a sample shipment of goods weighing ten metric tons ("MT").  SSV

Case Br. Attach. 2–3, PD 197 (June 6, 2014), ECF No. 58.  For its *Final Determination*,

Commerce calculated B&H surrogate values in dollars per metric ton "by dividing the total costs

shown in the Doing Business report (for documents preparation, customs clearance and technical

control, and ports and terminal handling) by 10—[because] the hypothetical container that was

the focus of the Doing Business [r]eport's estimates contained 10 tons of the hypothetical

goods."  SSV Br. 23.  In other words, Commerce first divided by ten the total B&H costs (for

documents preparation, customs clearance and technical control, and ports and terminal

handling) given in the Doing Business report on imports and exports.  Doing this gave

Commerce the B&H costs per metric ton of goods imported and exported.  Commerce then

multiplied the per metric ton B&H costs on imports by the total metric tons of HRC that SSV

imported.  Final Analysis Mem. Attach. 2, PD 217 (July 16, 2014), ECF No. 58.  Commerce

used the same approach to calculate the surrogate value for B&H costs on exports of OCTG.

Surrogate Values Mem. Ex. 9, PD 152 (Feb. 20, 2014), ECF No. 73-2.  In doing so, Commerce

"assumed that the [B&H costs] would increase proportionately with the weight of the products

contained in each shipment."  SSV Br. 23.  This assumption, SSV argues, was "flawed and

contrary to law."  *Id.* at 24.

### B.  Discussion

SSV argues that Commerce erred in assuming "that the [B&H costs] would increase

proportionately with the weight of the products contained in each shipment."  *Id.* at 23.  For

example, "if the costs for exporting a 10-ton shipment would be $77, Commerce assumed that

the costs for exporting a 100-ton shipment would be $770, the costs for exporting a 1,000 ton

shipment would be $7,700, and so on."  *Id.*  Commerce failed to provide a detailed explanation

supported by substantial evidence for its conclusion that the B&H costs would increase

proportionately with the weight of the exported and imported goods.

In its *Final Determination*, Commerce detailed its decision to "use the weight of 10 MT for a

standard container."  I&D Mem. 8 (citation omitted).  It explained that calculating unit value

using a 10 MT weight per container is necessary to avoid a "distorted result," because "mixing

different sources of data in the B&H calculation would add inconsistency to the ratio

calculation."  *Id.* (citation omitted).  "Using 10 MT in the per-unit calculation maintains the

relationship between cost and quantity from the survey (which is important because the

numerator and the denominator of the calculation are dependent upon one another), makes use of

data from the same source, and is consistent with [Commerce's] practice."  *Id.* at 9 (citation

omitted).

Although helpful to resolving challenges to the standard container weight it uses when

calculating unit value, this explanation appears to shed no light on why Commerce assumed that

B&H costs for SSV increased proportionately with the weight of the product.[19]  Commerce

points to no evidence or law justifying its conclusion that document preparation costs, customs

clearance and technical control costs, and ports and terminal handlings costs should increase here

based on the weight of the total shipment of goods.  This court can "judge the propriety of

[Commerce's action] solely by the grounds invoked by" Commerce.  *Chenery*, 332 U.S. at 196.

Here, Commerce did not provide enough explanation or evidence for its finding that the B&H

costs should increase proportionately with the weight of the product.  Accordingly, the court

remands for further explanation or for a recalculation.[20]

---

[19] SSV argues that Commerce should alter its allocation in light of the holding in *CS Wind Vietnam Co. v. United States*, 38 CIT __, 971 F. Supp. 2d 1271 (2014).  SSV Br. 24–27.  There, the court held that Commerce failed to adequately explain its finding that B&H document preparation costs increased proportionately with the weight of the shipped goods.  *CS Wind*, 38 CIT at __, 971 F. Supp. 2d at 1294–95.  The court reasoned that Commerce's methodology assumed, without the support of substantial evidence, "that a shipment weighing less will incur lower document processing costs while a shipment weighing more will incur higher processing costs."  *Id.* at 1295; *see also Dupont Teijin Films China v. United States*, 38 CIT __, __, 7 F. Supp. 3d 1338, 1350–52 (2014) (remanding for Commerce to explain or change its conclusion that customs clearance fees and document preparation costs for containerized shipments increase proportionately with weight).  *But see Dongguan Sunrise Furniture*, 36 CIT at __, 865 F. Supp. 2d at 1247 (finding that Commerce properly concluded that B&H values increase proportionately because respondent presented no evidence that values do not increase proportionately).  Here, rather than explaining why Commerce assumed that B&H costs increased proportionately with the increased weight of a shipment, Commerce explained that *CS Wind* was on remand and, therefore, "no final court decision" bound Commerce.  I&D Mem. 9.  This response is unconvincing.  *CS Wind* poses a question Commerce should have answered regardless of whether *CS Wind* bound Commerce's actions.  In other words, even if *CS Wind* did not bind Commerce, Commerce must still show that its allocation decision complied with the law and had the support of substantial evidence.  The court finds no evidence that Commerce attempted to make this showing.

[20] As an alternative, SSV argues that Commerce erred in using 10 MT as the standard weight for a container instead of the maximum capacity of the container, which is 21.727 MT.  SSV Br. 31–33.  As detailed above, Commerce clearly articulated the reasons that it chose a 10 MT weight.  Further, Commerce supported this reasoning with ample legal authority.  I&D Mem. 8–9 nn.27–28 (citing *Certain Steel Threaded Rod from the People's Republic of China*, 78 Fed. Reg. 66,330 (Dep't Commerce Nov. 5, 2013) (final admin. review) and accompanying I&D Mem. at cmt. 7; *Hardwood and Decorative Plywood from the People's Republic of China*, 78 Fed. Reg. 58,273 (Dep't Commerce Sept. 23, 2013) (final determ.) and accompanying I&D Mem. at cmt. 10; *Certain Frozen Warmwater Shrimp from the Socialist Republic of Vietnam*, 78 Fed. Reg. 56,211 (Dep't Commerce Sept. 12, 2013) (final admin. review) and accompanying I&D Mem. at cmt. 5; *Certain Steel Nails from the People's Republic of China*, 78 Fed. Reg. 16,651 (Dep't Commerce Mar. 18, 2013) (final admin. review) and accompanying I&D Mem. at cmt. 3).

Nonetheless, SSV references two proceedings to argue that Commerce violated an established practice when it chose the 10 MT weight over the 21.727 MT weight.  SSV Br. 31–33.  In one of these, Commerce rejected

## CONCLUSION AND ORDER

After carefully reviewing the briefs and administrative record, the court remands all

issues except the challenge to Commerce's refusal to apply partial adverse facts available to

SSV.

Accordingly, it is hereby:

**ORDERED** that the final determination of the United States Department of Commerce,
published as *Certain Oil Country Tubular Goods from the Socialist Republic of Vietnam*, 79 Fed.
Reg. 41,973 (Dep't Commerce July 18, 2014) (final determ.) and accompanying Issues &
Decision Mem., as amended by *Certain Oil Country Tubular Goods from India, the Republic of
Korea, Taiwan, the Republic of Turkey, and the Socialist Republic of Vietnam*, 79 Fed. Reg.
53,691 (Dep't Commerce Sept. 10, 2014) (amended final determ.) is hereby REMANDED to
Commerce for redetermination; it is further

**ORDERED** that both Plaintiff's and Defendant-Intervenor's Motions for Judgment on
the Agency Record Under USCIT Rule 56.2 are GRANTED in part as provided in this Opinion
and Order; it is further

**ORDERED** that Commerce shall issue a redetermination ("Remand Redetermination")
in accordance with this Opinion and Order that is in all respects supported by substantial
evidence and in accordance with law; it is further

**ORDERED** that Commerce provide a detailed explanation of, or reconsider, its decision
to treat all J55 HRC as a single input and value all J55 HRC based on the purchase of a single
variation of J55 HRC; it is further

**ORDERED** that Commerce either (1) explain why it concluded that trucking companies
commonly bear the risk of loss and why SSV had no insurance contract or (2) reclassify the
contract as an insurance contract; it is further

**ORDERED** that Commerce reconsider its selection of financial statements; it is further

---

the proposed 10 MT weight in favor of the respondent's actual average load weight per container because it found
"that the assumed weight of 10 MT [was] not referenced in" the 2013 version of the Doing Business report. *Welded
Stainless Pressure Pipe from the Socialist Republic of Vietnam*, 79 Fed. Reg. 31,092 (Dep't Commerce May 30,
2014) (final determ.) ("*Welded Pressure Pipe*") and accompanying I&D Mem. at cmt. 5. No parties discuss the
other proceeding that SSV referenced.

     SSV's reference to merely two prior proceedings fails to establish a practice with which Commerce had to
comply. And Commerce provided adequate evidence that its decision violated no established practice. That said,
even if *Welded Pressure Pipe* demonstrated a binding practice, it is a practice inapplicable to the facts here. *Welded
Pressure Pipe* rejected the 10 MT weight because no evidence existed that the Doing Business report relied on this
weight. *Id.* In contrast, here evidence exists that the report relied on the 10 MT weight. SSV Case Br. Attach. 3,
PD 197 (June 6, 2014), ECF No. 58. *Welded Pressure Pipe* is therefore irrelevant to resolving the issue here.
Commerce need not address this argument on remand.

**ORDERED** that Commerce reconsider its yield loss calculation and provide a thorough response to SSV's challenges to the calculation of yield loss; it is further

**ORDERED** that Commerce analyze the conflicting evidence concerning use of B&H costs on exports of OCTG and explain its decision to adjust or not adjust the B&H costs; it is further

**ORDERED** that Commerce (1) explain how its decision on financial statements affects, or does not affect, the decision to add B&H costs to imports of HRC, and (2) consider whether an agency practice bars Commerce from adding B&H costs to SSV's imports of HRC; it is further

**ORDERED** that Commerce thoroughly explain its finding that B&H costs increase proportionately with the weight of a shipment; it is further

**ORDERED** that Commerce shall have ninety (90) days from the date of this Opinion and Order in which to file its Remand Redetermination, which shall comply with all directives in this Opinion and Order; that the Plaintiff and Defendant-Intervenors shall have thirty (30) days from the filing of the Remand Redetermination in which to file comments thereon; and that the Defendant shall have thirty (30) days from the filing of Plaintiff's and Defendant-Intervenors' comments to file comments.

  /s/ Richard W. Goldberg
Richard W. Goldberg
Senior Judge

Dated: August 31, 2016
New York, New York