Slip Op. 17-133

UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| SEAH STEEL VINA CORPORATION,<br><br>                        Plaintiff,<br><br>v.<br><br>UNITED STATES,<br><br>                       Defendant,<br><br> and<br><br>MAVERICK TUBE CORPORATION, UNITED STATES STEEL CORPORATION, BOOMERANG TUBE LLC, ENERGEX TUBE (A DIVISION OF JMC STEEL GROUP), TEJAS TUBULAR PRODUCTS, TMK IPSCO, VALLOUREC STAR, L.P., and WELDED TUBE USA INC.,<br><br>                  Defendant-Intervenors. | Before: Richard W. Goldberg, Senior Judge<br>Consolidated Court No. 14-00224<br><br>**PUBLIC VERSION** |

## OPINION AND ORDER

[The court remands the final results of the redetermination.]

Dated:  September 28, 2017

     *Jeffrey M. Winton*, Law Office of Jeffrey M. Winton PLLC, of Washington, DC, for plaintiff.

     *Emma E. Bond*, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, for defendant.  With her on the brief were *Chad A. Readler*, Acting Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Claudia Burke*, Assistant Director.  Of counsel on the brief was *Catherine Miller*, Office of the Chief Counsel for Import Administration, U.S. Department of Commerce, of Washington, DC.

     *Jeffrey D. Gerrish* and *Luke A. Meisner*, Skadden, Arps, Slate, Meagher & Flom LLP, of Washington, DC, for defendant-intervenor United States Steel Corporation.

*Alan H. Price*, *Adam M. Teslik*, *Laura El-Sabaawi*, *Robert E. DeFrancesco, III*, Wiley Rein, LLP, of Washington, DC, for defendant-intervenor Maverick Tube Corporation.

*Roger B. Schagrin*, *Christopher T. Cloutier*, *John W. Bohn*, *Paul W. Jameson*, Schagrin Associates, of Washington DC, for defendant-intervenors Boomerang Tube LLC, Energex Tube (a Division of JMC Steel Group), Tejas Tubular Products, TMK IPSCO, Vallourec Star, L.P., and Welded Tube USA Inc.

Goldberg, Senior Judge: This case concerns challenges to the antidumping duty determination of the U.S. Department of Commerce ("Commerce" or "the Department") for oil country tubular goods ("OCTG") from the Socialist Republic of Vietnam ("Vietnam"). *See Certain Oil Country Tubular Goods from the Socialist Republic of Vietnam*, 79 Fed. Reg. 41,973 (Dep't Commerce July 18, 2014) (final determ.) ("*Final Determination*") and accompanying Issues & Decision Mem. ("I&D Mem."), as amended by *Certain Oil Country Tubular Goods from India, the Republic of Korea, Taiwan, the Republic of Turkey, and the Socialist Republic of Vietnam*, 79 Fed. Reg. 53,691 (Dep't Commerce Sept. 10, 2014) (amended final determ.).

Both Plaintiff, SeAH Steel VINA Corporation ("SSV"), and Defendant-Intervenor, United States Steel Corporation ("U.S. Steel") moved for judgment on the agency record under USCIT Rule 56.2.  SSV challenged five aspects of the *Final Determination*.  Pl.'s Mot. for J. on Agency R. 4–11, ECF No. 54 ("SSV Br.").  U.S. Steel challenged four aspects of the *Final Determination*.  Def.-Intervenor's Mot. for J. on Agency R. 6–8, ECF No. 56 ("U.S. Steel Br.").  On August 31, 2016, the court resolved these motions by remanding for reconsideration all but one of the challenges to Commerce's *Final Determination*.  *SeAH Steel VINA Corp. v. United States*, 40 CIT __, 182 F. Supp. 3d 1316 (2016).  On May 1, 2017, Commerce issued its Final Results of Redetermination Pursuant to Court Remand ("Remand Results"), ECF No. 131-1.

Both SSV and U.S. Steel now challenge aspects of the Remand Results.  For the reasons below, the court remands in part and sustains in part.

## GENERAL BACKGROUND

The court assumes familiarity with the facts and law as discussed in its prior opinion. Nevertheless, the court summarizes the relevant details in its discussion of each challenge to the Remand Results.

U.S. Steel challenges two aspects of the Remand Results.  Comments of U.S. Steel Corp. on the Final Results of Redetermination Pursuant to Court Remand ("U.S. Steel Comments"), ECF No. 137.  First, U.S. Steel challenges Commerce's selection of surrogate values for SSV's hot rolled coil ("HRC").  U.S. Steel Comments 1–14.  Second, U.S. Steel challenges Commerce's calculation of yield loss.  U.S. Steel Comments 22–29.  The court remands Commerce's determination concerning the first challenge, and sustains Commerce's determination concerning the second challenge.

SSV raises four main challenges to the Remand Results.  Comments of Pl. on Commerce's Redeterminations ("SSV Comments"), ECF No. 138.  First, SSV argues that Commerce erred when it used the financial statements of Bhushan Steel Ltd. as a source of surrogate values.  SSV Comments 10–23.  Second, SSV argues that Commerce (1) erred in its finding that SSV purchased domestic inland insurance and (2) erred in its valuation of the alleged domestic inland insurance.  SSV Comments 2–10.  Third, SSV argues that Commerce "improperly included 'document preparation' costs in the calculation of export and import brokerage and handling costs."  SSV Comments 23–27.  Fourth, SSV argues that Commerce improperly allocated its brokerage and handlings costs.  SSV Comments 27–33.  The court remands Commerce's determinations concerning the second and fourth challenges, but sustains Commerce's determinations concerning the first and third challenges.

## JURISDICTION AND STANDARD OF REVIEW

The court exercises jurisdiction to hear this appeal under 28 U.S.C. § 1581(c). The court will sustain Commerce's determination unless the court concludes that the determination is "unsupported by substantial evidence on the record, or otherwise not in accordance with law . . . ." 19 U.S.C. § 1516a(b)(1)(B)(i). Substantial evidence amounts to "more than a mere scintilla" of evidence. *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951) (citation omitted). It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id*. (citation omitted). In other words, "substantial evidence" "can be translated roughly to mean 'is [the determination] unreasonable?'" *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1351 (Fed. Cir. 2006).

## DISCUSSION

**I.     Substantial Evidence Supports Commerce's Selection of a Surrogate Value for high-chromium J55 Hot-Rolled Coil, but the Court Remands for Further Explanation or Reconsideration of Commerce's Selection of a Surrogate Value for J55 Hot-Rolled Coil Containing a Higher Carbon Content.**

Although U.S. Steel supports Commerce's decision on remand to separately value the three variations of J55 HRC, U.S. Steel argues that Commerce erred in selecting surrogate values for the high-chromium J55 HRC and the upgradeable J55 HRC containing a higher carbon content ("J55-H"). U.S. Steel Comments 4–14. Substantial evidence supports Commerce's surrogate value selection for high-chromium J55 HRC but not J55-H HRC.

### A. Background

When companies from a nonmarket economy ("NME") country export merchandise, Commerce typically "determine[s] the normal value of the subject merchandise on the basis of the value of the factors of production utilized in producing the merchandise . . . ." 19 U.S.C. § 1677b(c)(1)(B). This "valuation of the factors of production shall be based on the best available

information regarding the values of such factors in a market economy [("ME")] country . . . ."
*Id.*

To accomplish this valuation, Commerce asked SSV to disclose "each type and grade of material used in the production process" of OCTG.  Commerce Questionnaire to SSV at D-8, PD 56–59 (Aug. 23, 2013), ECF No. 92.  SSV disclosed three types of J55 HRC.  First, reported that it consumed regular J55.  SSV Resp. to Sections C&D Questionnaire app. D-4-C ("C&D Resp."), PD 87–91 (Oct. 30, 2013), ECF No. 60.  SSV explained that [[     ]] of its J55 came from ME suppliers and [[     ]] came from NME suppliers.  C&D Resp. app. D-6, CD 21–28 (Oct. 30, 2013), ECF No. 60.  Second, SSV reported that it consumed high-chromium J55.  SSV Resp. to Suppl. Section D Questionnaire ("Suppl. D Resp.") app. SD-10, CD 36–39 (Jan. 13, 2014), ECF No. 60.  Third, SSV reported that it used J55 containing a higher carbon content ("J55-H") than regular J55.  SSV Resp. to Suppl. Section D Questionnaire ("Suppl. D Resp.") app. SD-10, CD 36–39 (Jan. 13, 2014), ECF No. 60; *see also* Pl.'s Resp. to Def.-Intervenor's Mot. for J. on Agency R. 10, ECF No. 66.  SSV purchased [[   ]] of its J55-H HRC from ME suppliers. U.S. Steel Comments 4.

On remand, Commerce decided to assign a separate surrogate value to each of the three variations of J55 HRC.  Remand Results 9.  Commerce explained that "valuing the three types of J55 using values specific to each input would be consistent with [Commerce's] normal practice."  Remand Results 9.  Moreover, Commerce reasoned that "a calculation that takes into account physical differences between inputs will result in a valuation that is more specific to the input which is likely, in turn, to lead to a more accurate calculation of normal value."  Remand Results 9. Commerce then explained its process for selecting surrogate values:

> The Department's practice when selecting factors of production, in accordance with
> section 773(c)(1) of the Tariff Act, is to use, to the extent practicable, surrogate values

which are publicly available, product-specific, representative of a broad market average, tax-exclusive, and contemporaneous with the POI.  The Department's practice at the time of . . . [the investigation] underlying this remand redetermination was to value an input using the actual price paid by the respondent where the respondent sourced an input from a ME supplier in meaningful quantities (*i.e.*, 33 percent or more of total purchases of the input) and paid in an ME currency . . . .

Remand Results 9 (citations omitted).

Commerce began its valuation of the regular J55 by explaining that "the record shows that SSV purchased more than 33 percent of its regular J55 HRC from ME sources during the POI . . . ."  Remand Results 10.  For that reason, Commerce found it "appropriate to value SSV's regular J55 using [the above-explained] standard methodology for valuing ME-sourced inputs."  Remand Results 10.  Thus, Commerce valued the regular J55 using SSV's ME purchases of regular J55.  U.S. Steel does not challenge this decision.

With regard to J55-H, Commerce decided to use Indian import price data for the HTS number under which SSV imported the J55-H, "HTS 7208.37.00 (non-alloy steel with a width greater than 600 mm)."  Remand Results 10.  U.S. Steel argues that Commerce should have instead used SSV's ME purchases of J55-H, even though these purchases occurred roughly six months before the POI.  U.S. Steel Comments 6.

With regard to high-chromium J55, Commerce used "Indian import price data for the HTS number under which [SSV] imported the" high-chromium J55, "HTS 7225.30.90 (alloy steel with width greater than 600 mm)."  Remand Results 10.  U.S. Steel argues that the Indian import data is aberrational and, therefore, Commerce should select alternative surrogate values for high-chromium J55.  U.S. Steel Comments 11–14.

**B. The Court Remands for Further Explanation or Reconsideration of Commerce's Valuation of J55-H HRC.**

As stated above, Commerce valued SSV's J55-H HRC using the Indian import data instead of the J55-H HRC that SSV actually purchased from ME sources with ME currency. Commerce stated that "SSV reported that it had no purchases of [J55-H] . . . during the POI." Remand Results 10.  It also stated that, when SSV imported J55-H to Vietnam, it did so under HTS 7208.37.00, which is the same HTS category of the Indian import data selected as a surrogate value.  Remand Results 10.  Commerce ultimately chose the Indian import data over SSV's actual ME purchases of J55-H "because, in addition to being publicly available, representative of a broad market average, tax-exclusive, and contemporaneous with the POI, the [Indian import] data are the most product-specific because they represent the same HTS category under which SSV actually imported the input . . . ."  Remand Results 10.

U.S. Steel contends that Commerce erred in using the Indian import data to value J55-H. U.S. Steel maintains that "Commerce's standard methodology for valuing inputs in a [NME]" is to "value an input using the actual price paid by the respondent where the respondent sourced an input from an ME supplier and paid for the input in an ME currency."[1]  U.S. Steel Comments 4 (citing *Antidumping Methodologies: Market Economy Inputs, Expected Non-Market Economy Wages, Duty Drawback; and Requests for Comments*, 71 Fed. Reg. 61,716, 61,717–18 (Dep't

---

[1] In Defendant's Response to Comments Regarding Remand Redetermination ("Gov't Comments"), ECF No. 148, the Government argues that this "market-economy-purchase rule" is inapplicable to SSV's ME purchases of J55-H.  Gov't Comments 32.  As the Government explains, the rule includes an additional requirement.  The rule applies—and Commerce will normally use the actual ME purchases of an input—when the ME purchases occurred "during the period of investigation or review . . . ."  *Antidumping Methodologies: Market Economy Inputs, Expected Non-Market Economy Wages, Duty Drawback; and Requests for Comments*, 71 Fed. Reg. 61,716, 61,717–18 (Dep't Commerce Oct. 19, 2006)).  SSV's ME purchases of J55-H were outside the POI.  Thus, the "market-economy-purchase rule" does not here create a rebuttable presumption that Commerce will use SSV's ME purchases.  Yet this realization fails to resolve U.S. Steel's challenge to Commerce's selection of a surrogate value.  Even if no rebuttable presumption exists that Commerce will use SSV's ME purchase to value J55-H, Commerce is still free to use SSV's ME purchases and substantial evidence must still support Commerce's rejection of the ME purchases.

Commerce Oct. 19, 2006)).  U.S. Steel asserts that SSV "purchased [[        ]] the upgradable

[J55-H] . . . from ME sources [[                                            ]]."  U.S. Steel Comments 4.

U.S. Steel concludes that, "consistent with its standard methodology, Commerce should have

valued [SSV's] upgradable J55-H hot-rolled coil using the price that [SSV] paid to its ME

suppliers."  U.S. Steel Comments 4.  For this reason, U.S. Steel requests a remand.

 Nonetheless, U.S. Steel next posits that, regardless of the above methodology and its

application, "the contemporaneity of the data cannot be the sole decisive factor in Commerce's

selection among alternative surrogate value data."[2]  U.S. Steel Comments 5.  Instead, U.S. Steel

maintains, "Commerce must consider all of the factors and evidence that are relevant to selecting

the most appropriate surrogate value data."[3]  U.S. Steel Comments 5.  Further, although

"Commerce may invoke contemporaneity as a tie-breaking factor when choosing between

equally reliable datasets," "contemporaneity alone is an insufficient reason for dismissing

alternative surrogates when Commerce's own surrogate appears flawed."  U.S. Steel Comments

5–6 (quoting *Blue Field (Sichuan) Food Indus. Co. v. United States*, 37 CIT __, __, 949 F. Supp.

2d 1311, 1331 (2013)).

 Here, the Indian import data that Commerce used are not necessarily specific to the J55-

H input being valued, as the HTS Code 7208.37.00 of the Indian data includes more than solely

J55-H HRC.  U.S. Steel Comments 7.  As a result, U.S. Steel concludes that Commerce erred

because (1) "Commerce discarded [SSV's] ME purchases of upgradable J55-H hot-rolled coil for

---

[2] For this proposition, U.S. Steel cites *Golden Dragon Precise Copper Tube Group, Inc. v. United States*, Slip-Op 16-80, 2016 WL 4442163, at *5 (CIT Aug. 23, 2016) ("While the Artemivskyy statement may be more contemporaneous than the Furukawa statement, the selection of a financial statement requires balancing of several factors, of which more overlap with the POR is one.")

[3] For this, U.S. Steel cites *Dorbest Ltd. v. United States*, 30 CIT 1671, 1695 n.14, 462 F. Supp. 2d 1262, 1284 n.14 (2006) (announcing that "contemporaneity, in and of itself should not be viewed as the sole reason to discard data; rather the quality of the data needs to be viewed in its totality.").

the sole reason that they were not contemporaneous with the POI," and (2) "instead selected

flawed import data that," unlike SSV's ME purchases of J55-H, (3) "are not specific to the input

being valued."  U.S. Steel Comments 6.  On this basis, U.S. Steel requests a remand.

      In response, Commerce offered little insight into its preference for contemporaneity over

specificity. It stated in summary fashion:

> While we agree that [Commerce] normally values an input with a respondent's ME
> purchase prices when appropriate ME prices relating to purchases made during the POI
> are available, we note that in this case, SSV's ME purchases of J55-H coil were made
> prior to the POI.  It is not [Commerce's] practice to value inputs using ME prices derived
> from a period prior to the POI, and Petitioner has cited to no cases in which [Commerce]
> has done so.

Remand Results 47.  Commerce then concluded that, "[d]espite Petitioner's argument that the

HTS category used to value J55-H coil may contain types of coil other than J55-H, we continue

to find that the data within this HTS category is the most specific to the input being valued and

is, therefore, the best information on the record for valuing this input." Remand Results 48.

      Commerce's explanation is not enough to overcome U.S. Steel's challenges.  As a

preliminary matter, it seems unmistakably incorrect to proclaim, as Commerce did, that the

Indian import data are "the most specific to the" J55-H.  Remand Results 48. The Indian import

data concerning HTS category 7208.37.00 cover more than J55-H HRC, whereas data

concerning SSV's own ME purchases of J55-H HRC cover only J55-H HRC.  By definition, that

renders data of SSV's ME purchases of J55-H, and not the Indian import data, "the most specific

to the" J55-H.

      Further, the court is unable to understand from Commerce's scant explanation why

Commerce prioritized contemporaneity over specificity.  As stated above, Commerce decided to

optimize accuracy by using surrogate values specific to the three variations of J55 HRC.  For

J55-H, Commerce had two options: it could choose a more specific surrogate value lacking

contemporaneity, or it could choose a less specific, albeit contemporaneous, surrogate value.

Commerce discarded the more specific surrogate value—SSV's actual ME purchases—because

the sales occurred about six months before the POI.  It chose the Indian import data, which lack

specificity, because the Indian import data were contemporaneous.  When "Commerce is faced

with the choice of selecting from among imperfect alternatives, it has the discretion to select the

best available information for a surrogate value so long as its decision is reasonable." *CS Wind*

*Vietnam, Co. v. United States*, Slip Op. 14-128, 2014 WL 5510084 (CIT Nov. 3, 2014) (citation

omitted).  The court cannot yet say that Commerce's decision was reasonable.  Commerce did

not explain its prioritization decision and it appears that Commerce improperly deemed

"contemporaneity, in and of itself," as the "sole reason to discard" SSV's ME purchases of J55-

H in favor of a flawed alternative.  *Dorbest Ltd. v. United States*, 30 CIT 1671, 1695 n.14, 462 F.

Supp. 2d 1262, 1284 n.14; *see also Blue Field (Sichuan) Food Indus. Co.*, 37 CIT at __, 949 F.

Supp. 2d at 1331 (explaining that, while "Commerce may invoke contemporaneity as a tie-

breaking factor when choosing between equally reliable datasets," "contemporaneity alone is an

insufficient reason for dismissing alternative surrogates when Commerce's own surrogate

appears flawed." (citation omitted)).  So the court cannot now say whether it was reasonable to

prioritize contemporaneity over specificity.  Accordingly, the court remands for Commerce to

either provide a more exhaustive explanation of its preference or, alternatively, to change its

preference.

### C.  Substantial Evidence Supports Commerce's Selection of a Surrogate Value for the High-Chromium J55 HRC.

Commerce used Indian import price data for HTS number 7225.30.90 (alloy steel with a

width greater than 600 mm) to value SSV's use of high-chromium J55.  Remand Results 10.

This is the same HTS number under which SSV imported the high-chromium J55.  Remand

Results 10.  Further, "this HTS category represents the same type and width of HRC that the

record indicates was used by SSV."  Remand Results 11.

U.S. Steel argues that the Indian import data are aberrational and, therefore, Commerce

should select alternative surrogate values for high-chromium J55.  U.S. Steel Comment 11–14.

U.S. Steel correctly explains that Commerce's well-established practice is to reject import price

data that are aberrational.  U.S. Steel Comments 11.  According to U.S. Steel, the Indian import

data are "aberrational when compared to other benchmark prices for alloy hot-rolled coil that are

on the record."  U.S. Steel Comments 11.  The Indian import data for HTS 7225.30.90 yielded a

value of [[          ]]  U.S. Steel Comments 12.  To illustrate the ostensibly aberrational nature

of this value, U.S. Steel cites the values for alloy hot-rolled coil with a width greater than 600

mm from five other countries: Indonesia ($888.07/MT), Korea ($864.58/MT), Mexico

($940.87/MT), Thailand ($755.31/MT), and the Philippines ($1,377.59/MT).  U.S. Steel

Comments 12–13.

U.S Steel concedes that four of the above benchmarks represent prices in countries that

Commerce has not deemed economically comparable to Vietnam.  U.S. Steel Comments 13.

However, U.S. Steel insists that this is unproblematic, as "Commerce has relied on benchmark

prices from countries that are not economically comparable to the subject country in prior

proceedings."  U.S. Steel Comments 13 (citing *Olympia Indus., Inc. v. United States*, 23 CIT 80,

83, 36 F. Supp. 2d 414, 416 (1999)).   In addition, U.S. Steel acknowledges that, for the one

economically comparable country, the Philippines, the data are not contemporaneous with the

POI.  U.S. Steel Comments 13–14.  U.S. Steel then appears to argue that, because Commerce

offered no record evidence showing that the non-contemporaneous price in the Philippines is *not*

reflective of price during the POI, the Philippines data are reflective of price during the POI and can be used as a benchmark.  U.S. Steel Comments 14.

Commerce rejected U.S. Steel's arguments, and the court finds that substantial evidence supports Commerce's decision.  As stated above, Commerce chose the Indian import data because it determined that the data "represent[] the same type and width of HRC that the record indicates was used by SSV."  Remand Results 11.  In addition, Commerce chose the Indian import data because the HTS number is the same HTS number under which SSV imported the high-chromium J55.  Remand Results 10.  In other words, Commerce ultimately concluded that the "Indian import data under HTS 7225.30.90 [is] the best information available on the record for valuing [high-chromium J55] because it is contemporaneous, specific to the input, publicly available, tax and duty-free, and representative of a broad market average."  Remand Results 13–14.  This was reasonable.

But Commerce provided more.  It gave two reasons for rejecting U.S. Steel's argument that the Indian import data are aberrational.  The court will consider each in turn.

First, "with respect to [U.S. Steel's] argument that Indian imports under HTS 7225.30.90 are aberrational based on prices for imports of HTS 7225.30.90 into Indonesia, Korea, Mexico, the Philippines, and Thailand, [Commerce] note[d] that of the countries listed, only the Philippines is at a level of economic comparability equal to that of Vietnam."  Remand Results 13.  Commerce stressed that U.S. Steel "cite[d] only one . . . instance, *i.e., Olympia*," 23 CIT, of Commerce using "countries not economically comparable to the country at issue in making 'aberrational' determinations."  Remand Results 48.  And according to Commerce, *Olympia* is inapplicable:

> [I]n the proceeding underlying *Olympia*, the Department reached its [aberration] determination based on analysis of data from two countries, one of which was

economically comparable, and one of which was economically non-comparable.  Thus,
*Olympia* differs from the instant case in that here, the record contains no evidence from
any economically comparable country that the data at issue are aberrational, other than
the data from the Philippines, which post-date the POI.

Remand Results 48–49.  Commerce then explained that, "in cases more recent than *Olympia*, the

Department has stated that it does not make determinations regarding aberrational data using

data from countries not economically comparable to the country being analyzed."  Remand

Results 49.  As support, Commerce cited *Xanthan Gum from the People's Republic of China*, 78

Fed. Reg. 33,351 (Dep't Commerce June 4, 2013) (final determ.) and accompanying Issues &

Decision Mem. at cmt. 16-A, in which Commerce stated: "the Department's practice for

determining whether an SV is aberrational is to compare it with the data for the input at issue

from the other countries found by the Department to be equally economically comparable to" the

subject country.  Remand Results 49.  Consequently, Commerce concluded that it has no practice

requiring the use of non-comparable country data to make an "aberrational determination."

Remand Results 49.  This is reasonable, particularly in light of the statutory preference for

surrogate values from countries "at a level of economic development comparable to that of the

nonmarket economy country . . . ."  19 U.S.C. § 1677b(c)(4)(A).  Therefore, Commerce did not

err in refusing to deem the Indian import data "aberrational" based on the prices in countries not

economically comparable to Vietnam.

        Second, Commerce refused to use the Philippines data to make an "aberrational

determination," even though this data reflected prices in an economically comparable country.

Remand Results 49.  Commerce explained that "the data for the Philippines that [U.S. Steel]

provided post-dates the POI."  Remand Results 13.   And Commerce maintained that U.S. Steel

"provide[d] no argument to support its assertion" that the Philippines data, which "post-date the

POI by six months," are not "irrelevant or unusable as benchmarks."  Remand Results 49.

Commerce then stated that, because it "must use the best available information pursuant to Section 773(c)(1) of the Act," it prefers "to use contemporaneous data in selecting a surrogate value." Remand Results 49; *see also Certain Hot-Rolled Carbon Steel Flat Prods. from Romania*, 70 Fed. Reg. 34,448 (Dep't Commerce June 14, 2005) (admin. review) and accompanying Issues & Decision Mem. at cmt. 2 ("To test the reliability of the surrogate values alleged to be aberrational, we compared the selected surrogate value for each [factor of production] to the [average unit values] calculated *for the same period . . . .*" (emphasis added)). This led Commerce to use the Indian import data, as it is contemporaneous, and ignore the Philippine data, as it is outside the POI.[4] Remand Results 49.

In the end, Commerce reasonably concluded that, "because these five countries are either not economically comparable to Vietnam or not contemporaneous with the POI, none of these countries compel the conclusion that the import data for India (which is economically comparable to Vietnam) for this HTS are aberrational." Remand Results 13.

After a review of the record evidence, the court finds that substantial evidence supports Commerce's well-reasoned explanation of its selection of the Indian import data to value the high-chromium J55. The Indian import data is contemporaneous, input-specific, and from an economically comparable country. Although U.S. Steel insists that the data is aberrational and, therefore, unsuitable for valuing high-chromium J55, U.S. Steel failed to prove any aberration, as there is no benchmark data with which Commerce can reasonably compare the Indian import data to ascertain whether the data is aberrational.[5]

---

[4] This decision is reasonable. Plus, without more data points from economically comparable countries, it seems just as likely that the Philippines import data is aberrationally high as it does that the Indian import data is, as U.S. Steel argues, aberrationally low. Thus, it is impossible to reasonably infer that the Indian import data is aberrational.

[5] SSV also challenges Commerce's valuation of high-chromium J55, arguing that Commerce should not calculate a separate surrogate value for high-chromium J55. SSV Comments 34–36. SSV speculates that:

II.     **The Court Sustains the Decision of Commerce to Use the Financial Statements of Bhushan Steel Ltd.**

SSV argues that Commerce erred in selecting the financial statements of Bhushan Steel Ltd. ("Bhushan").  U.S. Steel argues that Commerce acted properly.  After careful review, the court sustains Commerce's determination.

A.  **Background**

"When Commerce is constructing the normal value for a respondent in a [NME] country, Commerce must also take into account those costs that are not covered by the factors of production (the physical inputs and the wages of the workers directly involved in the manufacturing process)." *Mittal Steel Galati S.A. v. United States*, 31 CIT 1121, 1137, 502 F. Supp. 2d 1295, 1310 (2007); *see also* 19 U.S.C. § 1677b(c)(1).  In other words, "[b]ecause firms have general expenses and profits not traceable to a specific product, in order to capture these expenses and profits, Commerce must factor [into the normal value calculation] (1) factory overhead ('overhead'), (2) selling, general and administrative expenses ('SG&A'), and (3)

---

[T]he evidence in this case demonstrates that SSV would not have paid a higher market-economy price for steel coils with higher-Chromium content if it had purchased its coils from a market-economy supplier, because the extra Chromium content conveyed no value to SSV.  The extra Chromium content was included in the coils solely for the benefit of the Chinese suppliers, to allow them to take advantage of export tax rebates that would not have been allowed for exports of coils without the extra Chromium. SSV Comments 35.  By extension, SSV opines that, "[i]f Commerce disregards the actual prices SSV paid to its Chinese suppliers because Chinese-supplier prices do not reflect normal market practices, then it must also disregard the adulterations SSV's Chinese suppliers made to the coils they supplied to SSV, because those adulterations also do not reflect normal market practices."  SSV Comments 35–36.  For this reason, SSV claims, Commerce should ignore the elevated chromium content and treat SSV's purchases of high-chromium J55 as regular J55.  SSV Comments 35–36.

SSV cites no authority for this unconventional practice, which would have required Commerce to "engage in [a] motivational inquiry" of SSV's reasons for buying certain inputs. Gov't Comments 37.  As discussed in both *SeAH Steel VINA Corp. v. United States*, 40 CIT __, __, 182 F. Supp. 3d 1316, 1328–29 (2016) and the Remand Results 8–9, 50, Commerce has a practice of valuing a "factor using surrogate values that most closely match the composition" of the factor. Remand Results 8.  And so under Commerce's practice, the high-chromium J55 should be valued separately, because it has a distinct composition.  SSV cites nothing to support its own proposed novel practice or to refute the applicability of Commerce's established practice.  As a result, its argument is unpersuasive.

profit . . . ."  *Mittal Steel*, 31 CIT at 1137–38, 502 F. Supp. 2d at 1310 (citation and internal

quotation marks omitted).

To calculate and incorporate these costs, "Commerce relies upon financial statements

from one or more [surrogate] companies based in the primary surrogate country . . . ."  *Id.*  With

these financial statements, Commerce creates "financial ratios that [it] then applies to its factors

for production data in order to recreate the full expenses of the respondent."  *Id.*

Commerce selects the financial statements of producers based on "the quality, specificity,

and contemporaneity of the available financial statements."  *Dorbest Ltd.*, 30 CIT at 1716, 462 F.

Supp. 2d at 1301.  Additionally, in selecting surrogate producers, "Commerce may also consider

the 'representativeness of the production experience of the surrogate producers in relation to the

respondent's own experience.'"  *Id.* at 1301 (citation omitted).  Above all, Commerce must base

surrogate values "on the best available information regarding the values of such factors in a

market economy country . . . ."  19 U.S.C. § 1677b(c)(1)(B).

In its *Final Determination*, Commerce used the financial statements of a single company,

Welspun Corporation Limited ("Welspun"), for calculating the overhead, SG&A, and profit.

Before selecting Welspun, Commerce stated its established preference for using "the financial

statements of producers of identical merchandise."  I&D Mem. 18.  Commerce then asserted

that, consistent with its practice, "there is no need to consider using a company that makes only

comparable merchandise when there are usable financial statements on the record from

companies that produce identical merchandise."  I&D Mem. 17–18 (quoting *Certain Steel Nails*

*from the People's Republic of China*, 79 Fed. Reg. 19,316 (Dep't Commerce Apr. 8, 2014) (final

results) and accompanying Issues and Decision Mem. at cmt. 2 ("*Steel Nails from China*")).

Next, Commerce explained that its "preference for using the financial statements of producers of

identical merchandise is especially strong here because of the unique nature of OCTG among the

wide range of pipe products.  Specifically," Commerce explained, "it is among the most

expensive and profitable of all types of pipe products."  I&D Mem. 18.  In light of these

considerations, Commerce settled on Welspun because it "is a producer of OCTG, and its

financial statement is contemporaneous, publicly available, and evidences no receipt of

countervailable subsidies." I&D Mem. 19.

    In their motions for judgment on the agency record, U.S. Steel and SSV both argued that

Commerce should use additional companies.  Rule 56.2 SSV Br. 33–46, ECF No. 54; Rule 56.2

U.S. Steel Br. 33–37, ECF No. 56.  After all briefing and oral argument before this court, SSV

filed a motion for leave to submit supplemental information.  SSV Mot. for Leave, ECF No. 104.

The supplemental information suggested that, contrary to Commerce's finding in this

proceeding, Welspun is not a producer of OCTG.  SSV Mot. For Leave 5, ECF No. 104.  In

response, the Government requested a voluntary remand, Def.'s Resp. to SSV Mot. for Leave,

ECF No. 105, and this court granted SSV leave to submit supplemental information.  Order, ECF

No. 106.  The court granted the request for a voluntary remand.

    In its Remand Results, Commerce explained that, "[i]n determining the suitability of

surrogate values, the Department considers the available evidence with respect to the particular

facts of each case and evaluates the suitability of each source on a case-by-case basis."  Remand

Results 20.  Put differently, "when examining the merits of financial statements on the record,

the Department does not have an established hierarchy that automatically gives certain

characteristics more weight than others."  Remand Results 20-21.  Instead, Commerce "must

weigh available information" to "make a product and case-specific decision as to what

constitutes the 'best' available information."  Remand Results 21.

Commerce next reiterated its practice of using, "whenever possible, the financial statement of a producer of identical merchandise, rather than of comparable merchandise." Remand Results 21 (citing *Steel Nails from China*; *Persulfates from the People's Republic of China*, 70 Fed. Reg. 6,836 (Dep't Commerce Feb. 9, 2005) (final results) and accompanying Issues and Decision Mem. at cmt. 1). On this basis, Commerce rejected the Welspun statements, finding that there exists "insufficient evidence to conclude that Welspun is actually a producer of" OCTG. Remand Results 21. Instead, Commerce chose the Bhushan statements for the same reason it initially chose the Welspun statements. In other words, it chose Bhushan because the company "is a producer of identical merchandise, and the Department has a preference for using the financial statement[s] of a producer of identical merchandise." Remand Results 23. Commerce also selected Bhushan because the "financial statements are publicly available and contemporaneous with the POI." Remand Results 23.

### B.  Discussion

SSV insists that Commerce erred in relying on the Bhushan statements. SSV alleges two main problems with Commerce's selection. The court considers each in turn.

First, SSV correctly notes that "Bhushan is a fully integrated producer," whereas SSV "is a semi-integrated producer." Remand Results 22; *see also* SSV Comments 11–12. Thus, Bhushan is incompatible with one of Commerce's preferences, *i.e.*, its preference for producers with similar production experiences. Remand Results 22–23. That said, SSV acknowledges that Bhushan is compatible with another of Commerce's preferences, *i.e.*, its preference for producers of identical merchandise. SSV Comments 11–12. SSV argues that Commerce failed to explain why it prioritized a company that, though producing identical products, had dissimilarly integrated operations. This risks distorting the values for manufacturing overhead and SG&A

expenses.  SSV Comments 17.  As a result, SSV insists, "Commerce effectively assumed that

there is a fixed hierarchy that treats production of the subject merchandise as the most important

characteristic for choosing a source for surrogate financial ratios—despite Commerce's express

statement that there is no such hierarchy."  SSV Comments 12.

    For its part, Commerce stated that it finds "affirmative precedence to support utilizing

surrogate financial statements of companies with differing integration levels when no superior

option was available on the record."  Remand Results 22–23 (citing *Certain Oil Country Tubular*

*Goods from the People's Republic of China*, 75 Fed. Reg. 20,335 (Dep't Commerce Apr. 19,

2010) and accompanying Issues and Decision Mem. at cmt. 13).

    "Where Commerce is confronted with two alternatives (both of which have their good

and bad qualities), and Commerce has a preferred alternative, the court will not second-guess

Commerce's choice."  *Mittal Steel Galati S.A.*, 31 CIT at 1141; *see also Dorbest Ltd.*, 30 CIT at

1687, 462 F. Supp. 2d at 1277 (explaining that when "Commerce is faced with a choice between

two imperfect options, it is within Commerce's discretion to determine which choice represents

the best available information"); *FMC Corp. v. United States*, 27 CIT 240, 251 (2002) ("When

Commerce is faced with the decision to choose between two reasonable alternatives and one

alternative is favored over the other in their eyes, then they have the discretion to choose

accordingly." (citation omitted)).  Moreover, Commerce has "wide discretion in the valuation of

factors of production . . . ."  *Shakeproof Assembly Components, Div. of Ill. Tool Works, Inc. v.*

*United States*, 268 F.3d 1376, 1381 (Fed. Cir. 2001) (citation omitted).

    Here, Commerce faced imperfect options, and "no superior option[s]."  Remand Results

22–23.  And Commerce mentioned earlier that, given the "unique nature" of OCTG, it was

particularly important to use financial statements from a producer of identical merchandise.  I&D

Mem. 18.  It was reasonable for Commerce to prioritize a company that produces OCTG, even if

the company is integrated at a different level.  The court will not second-guess Commerce's

reasonable exercise of its "wide discretion" to choose from among "imperfect options."[6]

    Second, SSV disputes Commerce's conclusion that Bhushan produces OCTG and APL

Apollo Tubes Limited ("Apollo"), via its subsidiary, Lloyds, does not produce OCTG.  SSV

Comments 13–17.  It is unclear if SSV is arguing that Bhushan produces no OCTG or, instead,

that Apollo produces OCTG.

    If SSV is arguing that Bhushan produces no OCTG, the court finds that SSV failed to

exhaust its administrative remedies on this argument.  This court "shall, where appropriate,

require the exhaustion of administrative remedies."  28 U.S.C. § 2637(d).  The court has

"generally taken a strict view of the need for parties to exhaust their remedies by raising all

arguments in a timely fashion so that they may be appropriately addressed by the agency."

*Nakornthai Strip Mill Pub. Co. v. United States*, 32 CIT 553, 564, 558 F. Supp. 2d 1319, 1329

(2008) (citation omitted); *see also United States v. L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 37

(1952) ("Simple fairness to those who are engaged in the tasks of administration, and to litigants,

requires as a general rule that courts should not topple over administrative decisions unless the

administrative body not only has erred but has erred against objection made at the time

appropriate under its practice.").  SSV had a "full and fair opportunity to raise" this issue before

---

[6] Related to this, SSV also argues that the rationale for preferring producers of identical merchandise is inapplicable here.  SSV cites the ratios of non-integrated companies on the record to argue that Bhushan's status as an integrated producer distorts the valuation of overheard and SG&A expenses.  SSV Comments 17–23.  SSV also argues that OCTG sales constitute an extremely small portion of Bhushan's overall sales, making "the profit figure in Bhushan's financial statements" unrepresentative of the profit figure of an OCTG producer.  SSV Comments 19–21.  SSV is correct that Bhushan's statements are imperfect.  But the alternatives are also imperfect.  And SSV offers no reason that the imperfections in Bhushan's statements produce greater inaccuracy than the imperfections in other record statements.  Accordingly, for the reasons described above, the court sees no justification for second-guessing Commerce's selection from among imperfect alternatives.

Commerce on remand. *Qingdao Taifa Group Co. v. United States*, 33 CIT 1090, 1093, 637 F. Supp. 2d 1231, 1236 (2009). It did not. And the court will not allow it do so now.[7]

    If SSV is arguing that Apollo's statements reflect the production of OCTG and should be used instead of, or alongside, Bhushan's statements, the court finds this argument unavailing. Commerce explained its rationale for rejecting the financial statements of Apollo:

> We previously found in the LFTV investigation that Apollo itself does not produce OCTG. The record contains evidence that its subsidiary, Lloyds, is 5CT certified, and, therefore, capable of producing OCTG. However, similar to the facts related to Welspun's financial statements, Apollo's consolidated financial statements do not affirmatively indicate that its subsidiary, Lloyds, produced OCTG during the POI.[8]

Remand Results 22 (citations omitted). SSV offers no evidence that either Apollo or Lloyd's actually produced OCTG. Instead, SSV alleges that the same quality and quantity of evidence exists that Lloyds produced OCTG as exists that Bhushan produced OCTG. To prove this, SSV lists all potential references in Bhushan's statements to OCTG, which SSV claims fail to "describe any actual OCTG production by Bhushan . . . ." SSV Comments 15–17. Without comparing the references in Bhushan's statements to content in Apollo's statements, SSV concludes:

> Both companies were licensed to produce OCTG meeting API 5CT standards. Both companies mentioned the ability to produce API 5CT products on their websites. But neither company's financial statements reported any actual production or sales of OCTG during the period. Consequently, Commerce's conclusion that Bhushan produced OCTG while Lloyds did not cannot be upheld.

---

[7] No exhaustion exceptions apply here. This is not a pure question of law, there was no lack of access to the confidential record, there is no intervening legal decision, and it would not have been futile to raise this issue at the administrative level. *See Gerber Food (Yunnan) Co. v. United States*, 33 CIT 186, 193, 601 F. Supp. 2d 1370, 1377 (2009) (listing exhaustion exceptions).

[8] Commerce later repeated that "[w]ith respect to Apollo, there is no information on the record that indicates that Apollo produces, or has ever produced, OCTG. With respect to Lloyds, while the record reflects that Lloyds is certified to produce OCTG, there is no affirmative record evidence indicating that it actually produced OCTG during the POI." Remand Results 56 (citation omitted).

SSV Comments 17.  In short, SSV alleges that, if Commerce found sufficient evidence that

Bhushan produced OCTG, it must likewise find sufficient evidence that Lloyds produced OCTG.

This argument is unconvincing.  SSV did not actually contrast the Bhushan and

Apollo/Lloyd statements, so SSV failed to establish that, in fact, "the evidence for Bhushan's

production of OCTG is exactly the same as the evidence for Lloyd's OCTG production . . . ."

SSV Comments 17.  Indeed, the evidence on the record appears to prove the opposite—stronger

evidence exists that Bhushan produced OCTG than that Apollo/Lloyds produced OCTG.  *See*

SSV Comments 16–17; U.S. Steel Comments 18 n.7.  Therefore, Bhushan's financial statements

fail to prove that Apollo/Lloyds produced OCTG.

Nevertheless, even if the court were to adopt SSV's argument, Commerce provided a

weighty independent basis for rejecting the Apollo financial statements: "Our confidence . . . [in

the Apollo/Lloyds financial statement] is further diminished by the fact that Apollo's

consolidated financial statement does not include an auditor's opinion for Lloyd's financial

statement, nor does it disclose the name of the entity that audited Lloyds' financial statement."[9]

Remand Results 56.  In contrast, "Bhushan included an audit opinion and provided the auditor's

name with a registration number."  Gov't Comments 16.

SSV insists that "[t]here is no evidence on the record concerning [the firm that audited

Bhushan's statements] or its reliability as an auditor, and thus no basis for concluding that

Bhushan's audited financial statements were in any way more reliable than the consolidated"

Apollo/Lloyds financial statements.  SSV Comments 21.  But Commerce need not audit the

---

[9] Commerce also explained that, "in [its] Final Determination from the LTFV investigation [it] found that not all of Lloyds' financial statements were separately included in the consolidated Apollo financial statements on the record, and because of the consolidated nature of those financial statements, we could not be certain that the Apollo financial statements contained financial ratios which were as representative of an actual Indian producer of OCTG . . . ."  Remand Results 22.

auditor.  It can instead accept the independent auditor's report as reliable unless "compelling

evidence" exists that the auditor is not in "good standing."  *Certain Stainless Steel Butt-Weld*

*Pipe Fittings from Taiwan*, 71 Fed. Reg. 67,098 (Dep't Commerce Nov. 20, 2006) (final results)

and accompanying Issues and Decision Mem. at cmt. 1.  As a result, Commerce had reason to

trust the reliability of Bhushan's statements and not Apollo/Lloyds' statements.

 In the end, substantial evidence supports Commerce's decision to discard the

Apollo/Lloyd statements and use the Bhushan statements.

### III. The Court Sustains Commerce's Calculation of Yield Loss.

 U.S. Steel challenges Commerce's recalculation of yield loss in the Remand Results.

U.S. Steel Comments 22–29.  Though SSV challenged the yield loss calculation in the *Final*

*Determination*, it does not challenge the recalculation in the Remand Results.  The court sustains

the yield loss determination.

### A.  Background

 In its *Final Determination*, Commerce adjusted the normal value of OCTG to account for

yield loss.  I&D Mem. 38.  Documents obtained during verification formed the basis for the yield

loss calculation.  Sales Verification Report 11–12, CD 169 (May 30, 2014), ECF No. 58.  These

documents showed that before the period of investigation, SSV's U.S. affiliate rejected as

defective [[    ]] percent of SSV's shipment of upgradeable OCTG (OCTG made

with J55 coil containing elevated carbon levels).  Final Analysis Mem. 1–2, CD 182 (July 10,

2014), ECF No. 73-3.  From this information, Commerce increased SSV's usage rate of inputs

by [[ ]] percent.   Final Analysis Mem. 1–2, CD 182 (July 10, 2014), ECF No. 73-3.

 SSV challenged the calculation.  Among other claims, SSV claimed that a [[ ]]

percent yield loss was inaccurate because Commerce calculated this loss using exclusively

transactions of upgradeable OCTG exported before the period of investigation rather than all the

transactions of OCTG.  Rule 56.2 SSV Br. 47–48, ECF No. 54.  The Government requested a

voluntary remand to reconsider its calculation of yield loss. Gov't Resp. 46, ECF No. 65.  The

court granted a remand.  *SeAH Steel VINA Corp.*, 40 CIT at __, 182 F. Supp. 3d at 1333–34.

On remand, Commerce recalculated SSV's yield loss.  As stated above, Commerce

initially calculated yield loss in the *Final Determination* by dividing the amount of upgradeable

OCTG from SSV that the affiliate sold as scrap by the affiliate's total sales volume of

upgradeable OCTG from SSV. Remand Results 26.  In the Remand Results, Commerce changed

the denominator.  Remand Results 26.  Thus, it calculated yield loss by dividing the amount of

upgradeable OCTG from SSV that the affiliate sold as scrap by the affiliate's total sales volume

of *all* subject merchandise from SSV during the POI.  Remand Results 26–27.  Rather than a

yield loss of [[              ]] this new method of calculation resulted in a yield loss of [[     ]]

percent.  Remand Results 24.  Commerce explained that it "base[d] this determination on the fact

that there is no evidence that [the affiliate] had any sales of scrap other than the one sale to which

[U.S. Steel] cites."  Remand Results 26.

### B.  Discussion

U.S. Steel argues that "Commerce's original adjustment of [[     ]] percent was the most

accurate adjustment based on the available record evidence."  U.S. Steel Comments 29.

According to U.S. Steel, Commerce "clearly erred in using the total quantity of [SSV's] U.S.

sales of OCTG as the denominator in its calculations of the amount of unreported yield loss."

U.S. Steel Comments 26.  Doing so lacked the support of substantial evidence, U.S. Steel asserts.

U.S. Steel Comments 29.  Instead, U.S. Steel maintains that "the appropriate denominator to use

in the calculation of the percentage of OCTG that was identified as defective scrap was the total

quantity of upgradable merchandise that was sold." U.S Steel Comments 26.

  To prove this, U.S. Steel cites record evidence pertaining to other inventory accounts and

sales records, not included in Commerce's calculation, of scrap OCTG from SSV and its

affiliate.  U.S. Steel Comments 25–27.  Allegedly, these accounts demonstrate that the [[    ]]

percent yield loss was conservative, because evidence of additional SSV-sourced OCTG scrap

existed, and this additional scrap ensures that the yield loss applicable to the upgradable OCTG

was either the same as, or lower than, the yield loss applicable to remainder of the non-

upgradable OCTG.  U.S. Steel Comments 23–27.  Thus, U.S. Steel asserts, using the [[    ]]

percent ratio, which was calculated using the affiliate's upgradable OCTG sales as the

denominator, produces an accurate estimate of overall yield loss.[10]  U.S. Steel Comments 29.

  But U.S. Steel's record citations offer no insight into SSV's yield loss, nor do they

indicate that the [[    ]] percent figure is either conservative or inflated.  As Commerce

explained, each record citation suffers from at least one of three fatal defects.

  One defect is that the [[

     ]] Remand Results 26.  In other words, although additional evidence of scrap

OCTG exists, Commerce has no way of knowing that the scrap came from SSV.  Accordingly,

"there is no conclusive evidence that [the affiliate] had any SSV-sourced sales of scrap, other

---

[10] U.S. Steel also posits that, "because complete information is only available for upgradable OCTG, it is only possible to calculate an adjustment by using defective upgradable OCTG in the numerator and total upgradable OCTG in the denominator of the ratio."  U.S. Steel Comments 29.  As proof, U.S. Steel theorizes that, "[w]hen estimating the ratio of defective OCTG to total OCTG, it is essential that both the numerator and the denominator of the ratio be on the same basis."  U.S. Steel Comments 27.  U.S. Steel contends that "the reason that the ratio must be calculated using only upgradable J55 OCTG is that this is the only type of OCTG for which [SSV] provided complete information regarding its sales of defective OCTG."  U.S. Steel Comments 28.  However, in response, the Government correctly explains that "the upgradable OCTG scrap is the known scrap sales for all relevant OCTG sales."  Gov't Comments 41.  Consequently, "upgradable OCTG scrap represents total OCTG scrap, making it appropriate to use total OCTG as the denominator."  Gov't Comments 41.

than the one sale of J55H [upgradable] OCTG scrap about which [Commerce] learned at verification." Remand Results 26–27. U.S. Steel does not dispute this. Commerce properly refused to assume that SSV-sourced scrap formed part of the cited accounts.

A second defect is that the record citations of accounts relate only to SSV's sales of upgradable OCTG, which account for a [[                    ]] of all SSV's sales to the affiliate, and thus have no relation to potential yield loss on the remaining [[          ]] of SSV's OCTG sales. Remand Results 60. As Commerce correctly notes, applying the yield loss of upgradable OCTG to all OCTG risks an inaccurate and inequitable yield loss result that effectively amounts to an unwarranted adverse inference against SSV.[11] Remand Results 60–61.

A third defect in the accounts cited by U.S. Steel is that they do not actually represent the final amount of scrap. Commerce explained that "[w]ith respect to the inventory records, [*i.e.*, the accounts cited by U.S. Steel, Commerce does] not find these data reliable for calculating a yield loss ratio because there is record evidence that SSV's [] affiliate sometimes repairs scrap OCTG and sells it as prime merchandise." Remand Results 60 (citation omitted). For that

---

[11] In essence, U.S. Steel's main argument is that Commerce "should not assume [[                    ]]" U.S. Steel Comments 26. U.S. Steel insists that this argument does not amount to a request for an adverse inference. U.S. Steel Comments 28. However, it states that the incomplete record information as to the source of the other scrap "is the result of [SSV's] failure to disclose." U.S. Steel Comments 26. Nevertheless, U.S. Steel also reasons: "There is nothing adverse about [[[                    ]]] ratio. It constitutes a conservative estimate based on the record evidence regarding the percentage of OCTG that [SSV] shipped to the United States that was ultimately found to be defective." U.S. Steel Comments 28.

The court rejects this argument. First, the only way to conclude that the estimate is "conservative" is to make assumptions about and rely on the above inventory accounts that U.S. Steel cites. For the above reasons, reliance on those accounts is unwarranted and the court cannot therefore deem the estimate "conservative." Second, as the Government stated, "it would be an adverse inference to assume that all the OCTG has a [[     ]] percent yield rate, simply because the [[   ]] percent of upgradable OCTG does." Gov't Comments 42. Thus, U.S. Steel is effectively asking for an adverse inference.

Even though U.S. Steel raised no affirmative argument that Commerce erred in failing to apply an adverse inference, Commerce explained that an adverse inference would be inappropriate. It stated: "the Department did not request such precise information about [the affiliate's] [[          ]] prior to the verification, and at verification [Commerce] officials requested no such information from [the affiliate] . . . regarding its yield loss for any forms of OCTG." Remand Results 61. Thus, a prerequisite to the application of an adverse inference was unsatisfied. *See* 19 U.S.C. § 1677e(b).

reason, even if the cited accounts showed scrap indicative of a yield loss greater than [[     ]]

percent, this does not actually signify a final yield loss of, or greater than, [[     ]] percent.

        The court finds that substantial evidence supports Commerce's determination.

Commerce calculated the yield loss by dividing the only known scrap OCTG by the total sales of

OCTG.  This was reasonable.  U.S. Steel contends that record evidence proves the existence of

additional SSV-sourced OCTG scrap, which would mean the yield rate should be higher.  But

the inventory accounts and sales that U.S. Steel cites do not establish the existence of any

additional SSV-sourced scrap because (1) they do not provide the source of the OCTG scrap, (2)

they relate exclusively to upgradable sales and prove nothing about non-upgradable sales, and (3)

they overstate scrap amounts by including product that will eventually be repaired and sold as

prime subject merchandise.  For this reason, Commerce reasonably discarded the information

that U.S. Steel provided and calculated the yield loss based on the only known OCTG scrap.

Doing otherwise—inferring a large amount of OCTG scrap as yield loss—"is not appropriate,

and could potentially be highly inequitable."  Remand Results 61.

IV.     **The Court Remands for Further Explanation or Reconsideration of Commerce's Selection of a Surrogate Value for Domestic Inland Insurance.**

        SSV argues that Commerce erred in finding the existence of an insurance contract that

requires a separate surrogate value.  SSV also argues that, even if such a contract exists and

requires a separate surrogate value, Commerce erred in calculating the value.  SSV Comments 2–

10.  After careful review, the court remands for Commerce to either provide more explanation of

or to reconsider its selection of a surrogate value for domestic inland insurance.

        **A. Background**

        Under 19 U.S.C. § 1677a(c)(2)(A), Commerce must reduce the export price by "the

amount, if any, . . . attributable to any additional costs, charges, or expenses . . . which are

incident to bringing the subject merchandise from the original place of shipment in the exporting

country to the place of delivery in the United States . . . ."  U.S. Steel believes that SSV

purchased insurance from [[                                                    ]] and that

Commerce should have valued and deducted the cost of this insurance from the export price

pursuant to 19 U.S.C. § 1677a(c)(2)(A).  U.S. Steel Rule 56.2 Br. 28, ECF No. 56.

      The contract between SSV and [[      ]] required [[      ]] to transport OCTG from

SSV's plant to the port in Vietnam.  SSV Suppl. Section A and C Resp. ("Suppl. A&C Resp.")

app. SC-5, CD 31–35 (Jan. 9, 2014), ECF No. 60.  The contract states that [[

      ]]  Suppl. A&C Resp.

app. SC-5 at 2.  The contract also includes the following provision:

    [[

      ]]

Suppl. A&C Resp. app. SC-5 at 2.  Additionally, the contract states that the price includes [[

     ]]  Suppl. A&C Resp. app. SC-5 at 3.  The contract apparently does

not limit [[      ]] liability to accidents or damage for which [[      ]] is responsible.  U.S.

Steel Rule 56.2 Br. 30, ECF No. 56.

      In its motion for judgment on the agency record, U.S. Steel insisted that the above

language establishes that [[      ]] charged SSV for both shipment and insurance of the OCTG.

U.S. Steel Rule 56.2 Br. 28–29, ECF No. 56.  U.S. Steel explained that Commerce has an

established practice of separately valuing domestic inland insurance when the insurance is

purchased "in conjunction with the provision of another service."  U.S. Steel Rule 56.2 Br. 29,

ECF No. 56.  As a result, U.S. Steel maintained that "Commerce should have valued the cost of

such insurance and deducted it as a movement expense from" the export price.  U.S. Steel Rule

56.2 Br. 28, ECF No. 56.  In its *Final Determination*, Commerce found otherwise:

> We disagree with [U.S. Steel] that the Department should deduct a surrogate value from
> SSV's U.S. price to represent domestic inland insurance.  As SSV has noted, it is not
> uncommon for trucking companies to bear the risk of loss on the shipments they handle.
> We do not find that the bearing of such risk constitutes an "insurance contract" that
> would require a separate surrogate value.

I&D Mem. 41.

The court reviewed the above determination and ruled that Commerce provided an

inadequate explanation of its determination.  The court explained:

> Commerce provides scant insight into its decision. . . . Commerce provides no
> explanation for why it believes that trucking companies commonly carry the risk of loss.
> Nor does it give any reasons for its refusal to classify the language of the freight
> agreement as an insurance contract requiring a separate surrogate value.  This is not
> enough.

*SeAH Steel VINA Corp.*, 40 CIT at __, 182 F. Supp. 3d at 1331.  The court concluded that it could

not "properly review [Commerce's] conclusion based on its explanations and its citations to the

data."  *Id.* (quoting *Diamond Sawblades Mfrs. Coal. V. United States*, 612 F.3d 1348, 1358 (Fed.

Cir. 2010)).

On remand, Commerce changed course.  It found: "Upon review of the record of this

proceeding, we have determined that the record does not substantiate the Department's finding

that trucking companies commonly bear the risk of loss, or that SSV did not have an insurance

contract with its trucking company."  Remand Results 16.  Based on this finding, Commerce also

found that "the Service Contract between SSV and its freight forwarder includes language to

insure SSV against 'any accidental or any damage to cargoes' for the full amount of the invoice."

Remand Results 16 (citation omitted).  Commerce explained: "Because [[         ]] of the

freight contract refers to [[

]] we find that this provision, as written, functions as an insurance

contract." Remand Results 53. Accordingly, Commerce "reclassified SSV's freight contract as

being inclusive of an insurance contract, and . . . included a surrogate value for domestic inland

insurance . . . ." Remand Results 16.

In selecting a surrogate value, Commerce acknowledged that it seeks to use "to the extent

practicable, surrogate values which are publicly available, product-specific, representative of a

broad market average, tax-exclusive, and contemporaneous with the POI." Remand Results 16.

It then explained that, "[i]n this investigation, the record contains one available surrogate value

source with which to value SSV's domestic inland insurance: inland insurance information

submitted by Argo Dutch Industries Limited [("Argo Dutch")] in the 2004–2005 administrative

review of certain preserved mushrooms from India." Remand Results 17.

Commerce concedes that the Argo Dutch value is flawed. It states: "The record does

not . . . establish whether [the Argo Dutch value] is tax exclusive, or indicate whether it is

representative of a broad market average." Remand Results 17. But, it explains, the Argo Dutch

value "is publicly available," "specific to inland insurance in the surrogate country," and capable

of being made contemporaneous by "using an inflator." Remand Results 17. Commerce

ultimately relies on the Argo Dutch data, because it "is the only source on the record for inland

insurance, and meets certain criteria for selecting surrogate values . . . ." Remand Results 17.

**B. Discussion**

SSV insists that "the relevant provision of SSV's contract with the freight forwarder is

not an agreement to obtain inland insurance." SSV Comments 3. Instead, the "provision

describes the normal liability of a common carrier under English, U.S., and Indian law." SSV

Comments 5. To corroborate this, SSV first lists cases from India, the United States, and the

King's Bench to establish that it is a "principle of common law" that common carriers bear the

risk of loss during transport.  SSV Comments 5.  It then reasons:

> In these circumstances, the obvious purpose of the relevant provision in SSV's agreement
> with the freight forwarder was to clarify that, notwithstanding what Vietnamese law
> might say, the risk of loss would be assigned in accordance with the normal legal rules
> that apply to freight contracts in market-economy countries like England, the United
> States, and India.

SSV Comments 6.  Next, SSV states that the surrogate value for inland freight was based on the

rates of Indian common carriers, which would mean the rates for inland freight included the cost

to common carriers of assuming the risk of loss.  Therefore, SSV claims, Commerce captured the

cost of assigning this risk of loss, and a separate surrogate value was excessive.  SSV Comments

7–8.

    Commerce correctly rejected this argument.  It concluded that insufficient record

evidence exists that common carriers typically bear the risk of loss.  Remand Results 52–53.

Moreover, SSV cites no reasons why it is "obvious" that SSV and [[          ]] intended to adopt

the alleged default risk of loss rules of India, the United States, and England.  Thus, Commerce

acted reasonably and with substantial evidence in finding that the plain language of the contract

"insure[d] SSV against 'any accidental or any damages to cargoes' for the full amount of the

invoice," and that the contract therefore was "inclusive of an insurance contract."  Remand

Results 16; *see also* Remand Results 53.

    As explained above, Commerce then chose data from Argo Dutch to value the domestic

inland insurance.  Commerce chose this data because (1) it "is the only source on the record for

inland insurance," (2) "it is publicly available," (3) it is "specific to inland insurance in the

surrogate country," and (4) it becomes contemporaneous "by using an inflator."  Remand Results

17; *see also* Remand Results 54–55.  Commerce admits that it does not know whether the Argo

Dutch data is tax exclusive and representative of a broad market average.  Remand Results 55.

However, substantial evidence does not support the selection of Argo Dutch as a

surrogate value.  As SSV explains, the Argo Dutch value is "not, in fact, an amount for inland

insurance."  SSV Comments 2.  Instead, the Argo Dutch value appears to reflect the cost of *both*

inland insurance and marine insurance.  U.S. Steel Surrogate Value Data and Calculations Part

III Tab J, Attach. 2, Ex. 9, ECF No. 73-1 ("Our insurance policy covers the product from our

factory to the U.S. port.  These insurance costs include inland and marine insurance . . . .").

What is more, SSV states that, "because mushrooms have a per-ton value that is roughly *ten*

*times* higher than that of OCTG, and because insurance is assessed on the basis of the insured

*value* of the merchandise, and not its weight, the cost of insurance per ton for mushrooms was

incredibly inflated compared to the actual cost in India of insuring steel pipe shipments."[12]  SSV

Comments 2–3 (citation omitted).

As referenced above, Commerce acknowledged that it seeks to use "to the extent

practicable, surrogate values which are publicly available, product-specific, representative of a

broad market average, tax-exclusive, and contemporaneous with the POI."  Remand Results 16.

But without more explanation from Commerce, it appears that the chosen surrogate value from

Argo Dutch is not specific to inland insurance.  As a result, Commerce has chosen a surrogate

value that may fulfill only two of the foregoing list of criteria—it is publicly available and it can

be adjusted to make it contemporaneous.  On these facts, this is not substantial evidence that the

Argo Dutch surrogate value adequately represents SSV's inland insurance costs.  On remand,

---

[12] As evidence, SSV explains that the mushrooms insured in the Argo Dutch data were sold on average for $12,650 per metric ton.  U.S. Steel SV Data and Calculations Part III Tab J, Attach. 2, Ex. 9, ECF No. 73-1.  SSV asserts that OCTG had a substantially lower cost.  SSV Comments 2 n.3.

Commerce has two options.  First, it can more fully explain why the Argo Dutch data, despite the above shortcomings, represents "the best available information and establishes antidumping margins as accurately as possible."  *Shakeproof Assembly Components, Div. of Ill. Tool Works, Inc.*, 268 F.3d at 1382.  Or second, Commerce can reconsider its decision to rely on the Argo Dutch surrogate value and, if necessary, use its discretion to reopen the record to gather additional evidence.[13]

### V.    Commerce Properly Valued SSV's Brokerage and Handling Costs.

SSV argues that "Commerce improperly included 'Document Preparation' costs in the calculation of export and import brokerage and handling [("B&H")] costs, even though the evidence confirmed that SSV did not pay its broker for such services."  SSV Comments 23.  The court sustains Commerce's calculation of B&H costs.

---

[13] SSV argues in the alternative that "Commerce did not provide SSV an adequate opportunity to provide surrogate value information for Vietnamese inland insurance."  SSV Comments 8.  For this reason, SSV argues that it should receive an "opportunity to supplement the record with information regarding the appropriate surrogate value for inland insurance."  SSV Comments 9–10 (citations omitted).  In opposition, the Government explains that "SSV did not even request to reopen the record . . . after U.S. Steel raised its inland insurance [argument] in its case brief.  Nor did it seek to do so after the Court remanded the insurance issue and instructed Commerce that it could 'reclassify the contract provision' on remand."  Gov't Comments 9 (citations omitted).  Rather, the Government states, "SSV waited to request to reopen the record until after Commerce had already issued its draft remand, and had to comply with an impending deadline to submit the final remand redetermination to this Court."  Gov't Comments 9.

The court finds that, contrary to SSV's claims, it received an opportunity to provide surrogate values for inland insurance.  Remand Results 54.  As both Commerce and SSV itself note, SSV missed the deadline to submit information.  SSV Comments 8–9; Remand Results 54.  SSV "could have chosen . . . , as did [U.S. Steel], to submit surrogate value information for domestic inland insurance."  Remand Results 54.  It did not.  It also waited until an inopportune time to seek to supplement the record.  In light of these facts, and because "[t]he decision to reopen the record is best left to" Commerce, the court will not order Commerce to open the record to allow SSV to provide additional surrogate values.  *Essar Steel Ltd. v. United States*, 678 F.3d 1268, 1278 (Fed. Cir. 2012); *see also Shandong Rongxin Import & Export Co. v. United States*, 41 CIT __, __, 203 F. Supp. 3d 1327, 1338 (2017) (explaining that "this Court may not <u>order</u> an administrative agency to reopen the record on remand in the absence of extraordinary circumstances." (citation omitted)); *Changshan Peer Bearing Co. v. United States*, 38 CIT __, __, 953 F. Supp. 2d 1354, 1362 (2014) (stating that "the court views an order compelling an agency to reopen an administrative record on remand as the exception rather than the rule, consistent with the principle that courts, as a general matter, should allow agencies to exercise discretion as to whether to reopen an administrative record on remand." (citation omitted)).

### A. Background

SSV incurred B&H expenses when it shipped goods from Vietnam to the United States.

Commerce's Resp. 28, CD 22 (Oct. 30, 2013), ECF No. 73-3.  To determine a surrogate value

for the B&H services, Commerce used the World Bank's report "Doing Business India: 2014"

("Doing Business Report").  I&D Mem. 6–7.  This report provides a total cost for B&H services,

and also breaks down this total cost into four subcategories:  "[c]ustoms clearance and technical

control" costs, "[p]orts and terminal handling" costs, "[i]nland transportation and handling"

costs, and "[d]ocuments preparation" costs.  Surrogate Value Sources Ex. IV at 2, PD 164 (Fed.

21, 2014), ECF No. 73-2.  The report lists the following nine documents under the category of

"Export Documents": (1) bill of lading, (2) certificate of origin, (3) commercial invoice, (4)

foreign exchange control form, (5) inspection report, (6) packing list, (7) shipping bill (customs

export declaration), (8) technical standard certificate, and (9) terminal handling receipts.

Surrogate Value Sources Ex. IV at 2, PD 164 (Fed. 21, 2014), ECF No. 73-2.   However, the

report does not provide individual costs for these documents.  Surrogate Value Sources Ex. IV at

2, PD 164 (Fed. 21, 2014), ECF No. 73-2.

The *Final Determination* included document preparation costs in the calculation of

SSV's B&H costs.  *See* Surrogate Values Mem. Ex. 9, PD 152 (Feb. 20, 2014), ECF No. 73-2.

In declining to adjust the B&H value to exclude document preparation costs, Commerce

explained the established practice governing its decision to adjust B&H surrogate values:

> [Commerce] will sometimes make an adjustment to surrogate value data to reflect
> an individual exporter's experience, including to B&H surrogate value data, but
> normally only when the item's amount is clearly identified in the 'Doing Business'
> report and the factors of production for self-preparation are accounted for.

I&D Mem. 7 (footnote omitted).  No party disputed the relevance or validity of this practice.

Consequently, to qualify for an adjustment to its B&H values, SSV had to satisfy two conditions.

First, the Doing Business Report must have clearly identified the cost for the documents that

SSV claims that it prepared without a broker.  Commerce concluded that the Doing Business

Report did not clearly identify the relevant costs.  I&D Mem. 7.  Second, Commerce must have

otherwise accounted for the factors of production for any self-preparation of documents.

Commerce never addressed the second condition.  Nonetheless, because Commerce found that

SSV failed to satisfy the first condition, it declined to adjust the B&H value.  I&D Mem. 7.

In its motion for judgment on the agency record, SSV contended that, because it did not

incur any "document preparation" costs, Commerce should adjust the B&H surrogate value by

excluding the "document preparation" costs.  Rule 56.2 Mot. for J. on Agency Record 11, 16,

ECF No 54.

The court remanded the issue to Commerce, concluding that Commerce had not

adequately explained why SSV failed to satisfy the first condition and it neglected to consider

the second condition.  *SeAH Steel VINA Corp.*, 40 CIT at __, 182 F. Supp. 3d at 1336–37.  In the

Remand Results, Commerce found that SSV failed to satisfy both conditions for an adjustment

and provided a more detailed explanation for this finding. [14]  Remand Results 31–34.

---

[14] As stated above, SSV challenges Commerce's inclusion of "Document Preparation" costs as to both
exports of OCTG *and* imports of HRC.  Like B&H costs pertaining to exports, the Doing Business Report for
imports provides a total B&H cost as well as subcategorized costs, which includes "[d]ocuments preparation" costs.
Surrogate Value Sources Ex. IV, PD 164 (Fed. 21, 2014), ECF No. 73-2.  Instead of nine documents, the "document
preparation" category for imports includes eleven documents.  Surrogate Value Sources Ex. IV, PD 164 (Fed. 21,
2014), ECF No. 73-2.  The Doing Business Report includes a cost for the aggregated eleven documents, but does not
particularize the costs of each individual document.  Surrogate Value Sources Ex. IV, PD 164 (Fed. 21, 2014), ECF
No. 73-2.
        At the administrative level, SSV argued that it did not incur "document preparation" costs on imports of
HRC, but Commerce refused to apply an adjustment in its *Final Determination*.  I&D Mem. 40.  Commerce
concluded that "SSV has presented no evidence that the B&H costs are included in the overhead reported on any of
the financial statements on the record."  I&D Mem. 40.  The court remanded for further explanation.  *SeAH Steel
VINA Corp.*, 40 CIT at __, 182 F. Supp. 3d at 1341.
        Here, SSV does not differentiate between arguments directed at B&H costs for exports and B&H costs for
imports.  Moreover, in the Remand Results, Commerce explained that it included "document preparation" costs on
imports of HRC for the same reasons it included "document preparation" costs on exports of OCTG.  Remand

### B. Discussion

To prove that it fulfilled the first condition for a B&H value adjustment, SSV insists that it did not pay a broker for any of the B&H documents.  Again, the nine documents are (1) certificate of origin; (2) foreign exchange control form; (3) terminal handling receipts; (4) bill of lading; (5) commercial invoice; (6) inspection report; (7) packing list; (8) shipping bill (customs export declaration); and (9) technical standard certificate.  SSV Case Br. Attach. 2, PD 197 (June 6, 2014), ECF No. 58.  According to a chart that counsel for SSV prepared in response to verification requests, nobody prepared documents (1) and (3) because these documents were unnecessary for shipment of OCTG.  SSV Verification Ex. 5, CD 84 (Apr. 14, 2014), ECF No. 58.  The ocean shipping company covered document (4).  SSV Verification Ex. 5, CD 84 (Apr. 14, 2014), ECF No. 58.  And SSV itself prepared documents (5) through (9).  SSV Verification Ex. 5, CD 84 (Apr. 14, 2014), ECF No. 58.  SSV also claims that nobody prepared the foreign exchange control form (document (2)), but the above chart says nothing about the source of the form.[15]  SSV Verification Ex. 5, CD 84 (Apr. 14, 2014), ECF No. 58; SSV Comments 23.

Although the Doing Business Report lists no individual costs for any of the foregoing documents, the report lists a total cost for document preparation services, and the nine foregoing documents comprise this total cost.  Surrogate Value Sources Ex. IV, PD 164 (Fed. 21, 2014), ECF No. 73-2.  As a result, SSV satisfies the first condition for an adjustment if its broker prepared none of the nine documents, because the total cost of the documents that SSV claims its broker did not prepare (whether because the documents were prepared by SSV, a third party, or

---

Results 38.  Thus, the same rationale applied to both imports of HRC and exports of OCTG.  On that basis, the court sustains Commerce's determination as to the "document preparation" costs of imports of HRC for the same reasons (discussed below) that it sustains the determination as to exports of OCTG.

[15] The foreign exchange control form is also one of the eleven documents listed in the "document preparation" category for imports. Surrogate Value Sources Ex. IV, PD 164 (Fed. 21, 2014), ECF No. 73-2

no one at all) would be "clearly identified" in the report.  Accordingly, SSV argues that, because

its broker prepared none of the nine documents, the "item's amount"—the amount for the

services that SSV did not receive from a broker, which here includes all the documents—is

"clearly identified in the Doing Business [R]eport."  Rule 56.2 Mot. for J. on Agency Record 14

(quoting I&D Mem. 7), ECF. 54 (citation omitted).  As a result, SSV maintains that it satisfied

the first of two conditions of Commerce's practice.  SSV Comments 23–27.

        Commerce disagreed.  In its Remand Results, it found "that the first condition, that [the]

Doing Business [Report] must clearly identify the cost for the documents that SSV claims that it

prepared without a broker, has not been met for two reasons."  Remand Results 31.

        First, "with respect to one of the nine [documents] listed in [the] Doing Business

[Report], specifically, the Foreign Exchange Control Form, SSV did not at any time during the

course of the investigation, identify this document as one that it did not use."  Remand Results

32.  Commerce is correct that the above chart offers no insight into the source or existence of the

foreign exchange control form.  SSV responds that, in fact, there is proof that "it did not use a

'Foreign Export Control Form' in connection with its export sales or import purchases."  SSV

Comments 24.  But the record evidence that SSV cites as proof is not determinative.  *See* SSV

Comments 24–25.  At most, the evidence suggests that it is possible that the foreign exchange

control form was not used.  It is thus unclear if SSV used this form, and Commerce therefore

correctly found that there exists insufficient evidence that a broker prepared none of the nine

documents of the "document preparation" category.  Therefore, the cost for the documents

prepared without a broker is not "clearly identified" in the Doing Business Report and, by

extension, the first of two necessary conditions for a B&H adjustment is unmet.  This alone is

sufficient to sustain Commerce's refusal to adjust the B&H calculation.

Nevertheless, Commerce provides a second reason that the first condition is unmet.

Record evidence confirms "that the freight forwarding contract shows that a party outside of

SSV is performing brokerage services."  Remand Results 33.  Commerce cites language from the

contract between SSV and its freight forwarding company, [[          ]], in which [[


]] Suppl. A&C Resp. app. SC-5 at 2, CD 31–35 (Jan 9,

2014), ECF No. 60.  The contract specifies that the fees for [[

]] Suppl. A&C Resp. app.

SC-5 at 3, CD 31–35 (Jan 9, 2014), ECF No. 60.  What is more, the contract with the freight

forwarding company requires SSV to [[

]] Suppl. A&C Resp. app. SC-5 at 2, CD 31–35

(Jan 9, 2014), ECF No. 60. (emphasis added).

SSV claims that this contract is simply a "generic agreement" that proves nothing about

whether the freight forwarding company actually provided B&H document preparation services.

SSV Comments 25. SSV also explains that statements given and documents reviewed at

verification indicate that the freight forwarding company did not provide document preparation

services.  SSV Comments 25–26.

The court disagrees.  SSV may be able to point to evidence suggesting that the freight

forwarding company provided no document preparation services.  But Commerce has substantial

evidence in the form of a contract whereby the freight forwarding company agrees to undertake

at least some document preparation services. *See American Silicon Techs. v. United States*, 261

F.3d 1371, 1376 (Fed. Cir. 2001) ("Even if it is possible to draw two inconsistent conclusions

from evidence in the record, such a possibility does not prevent Commerce's determination from

being supported by substantial evidence." (citations omitted)).  Consequently, the Doing

Business Report does not clearly identify the price of the documents that SSV paid no broker to

provide.  And SSV is not entitled to an adjustment.

The above finding—that the first of two conditions required for a B&H surrogate value

adjustment is unmet—obviates SSV's challenge to the Remand Results.  Yet Commerce also

analyzed the second condition, "that the Department must otherwise have accounted for the

factors of production for any self-preparation of documents."  Remand Results 34.  Commerce

explained:

> Such accounting is normally reflected in the Department's preliminary determination
> analysis memorandum, final determination analysis memorandum, or amended final
> determination analysis memorandum and must clearly indicate the expenses to which the
> Department made adjustments in calculating U.S. price.  None of these documents
> suggest that any adjustment was made for B&H document preparation fees other than
> through the B&H adjustment.  Thus, the second condition is not met.  Therefore, even if
> SSV did prepare all brokerage documentation internally, without the use of a broker, the
> Department would still need to select a surrogate value to represent B&H documentation
> fees.

Remand Results 34 (citations omitted).  For its part, SSV argues that Commerce did otherwise

account for the B&H costs.  SSV maintains that the surrogate values for overhead, SG&A and

interest expenses:

> [N]ecessarily capture the costs for purchasing department and administrative personnel
> (and the supplies they use), including the personnel who fill out forms like those required
> for brokerage and handling for import and export transactions.  Thus, the figures for
> overhead and SG&A and interest used by Commerce already reflect[] the costs of
> administrative personnel that perform document preparation.  Consequently, Commerce's
> separate adjustment for document preparation costs massively double-counted the actual
> costs.

SSV Comments 27.  But as the Government states, "SSV cites no documentation from Bhushan

(the company from which Commerce selected financial ratios) showing that Bhushan's internal

personnel prepared export and import documentation."  Gov't Comments 24.  Thus, there is no

evidence that financial ratios derived from Bhushan otherwise account for B&H costs.[16]

Accordingly, Commerce acted with the support of substantial evidence in finding that the second

necessary condition is also unfulfilled.  This provides additional support, and an alternative basis,

for Commerce's refusal to adjust SSV's B&H surrogate values.

## VI.   The Court Remands for Reconsideration or Further Explanation of Commerce's Allocation of Brokerage and Handling Costs.

SSV argues that "Commerce improperly allocated brokerage and handling costs based on

the false assumption that the costs would increase with every 10 tons that SSV exported."  SSV

Comments 27.  The court remands for either reconsideration or further explanation.

### A.  Background

As discussed, Commerce used the Doing Business Report to calculate surrogate values

for B&H services on both exports of OCTG and imports of HRC.  I&D Mem. 6–7, 40.  The

figures from the report assumed a sample shipment of goods weighing ten metric tons ("MT").

SSV Case Br. Attach. 2–3, PD 197 (June 6, 2014), ECF No. 58.  For its *Final Determination*,

Commerce calculated B&H surrogate values in dollars per metric ton "by dividing the total costs

shown in the Doing Business [R]eport (for documents preparation, customs clearance and

technical control, and ports and terminal handling) by 10—[because] the hypothetical container

that was the focus of the Doing Business Report's estimates contained 10 tons of the

hypothetical goods."  SSV Br. 23.  In other words, Commerce first divided by ten the total B&H

costs (for documents preparation, customs clearance and technical control, and ports and

terminal handling) given in the Doing Business Report on imports and exports.  Doing this gave

Commerce the B&H costs per metric ton of goods imported and exported.  Commerce then

---

[16] To eliminate the risk that Bhushan's statements would cause double-counting, Commerce removed "selling and distribution" costs from Bhushan's statements.  Remand Results 37.

multiplied the per metric ton B&H costs on imports by the total metric tons of HRC that SSV

imported.  Final Analysis Mem. Attach. 2, PD 217 (July 16, 2014), ECF No. 58.  Commerce

used the same approach to calculate the surrogate value for B&H costs on exports of OCTG.

Surrogate Values Mem. Ex. 9, PD 152 (Feb. 20, 2014), ECF No. 73-2.

        In doing so, Commerce "assumed that the [B&H] costs would increase proportionately

with the weight of the products contained in each shipment."  SSV Br. 23.  In its motion for

judgment on the agency record, SSV argued that this assumption was "flawed and contrary to

law."  SSV Br. 24.  The court concluded that Commerce "point[ed] to no evidence or law

justifying its conclusion that document preparation costs, customs clearance and technical

control costs, and ports and terminal handlings costs should increase here based on the weight of

the total shipment of goods."  *SeAH Steel VINA Corp.*, 40 CIT at __, 182 F. Supp. 3d at 1344.

"Accordingly, the court remand[ed] for further explanation or for a recalculation."  *Id.*

        On remand, Commerce continued to find that B&H costs increase proportionately with

weight.  Remand Results 41.  Commerce explained that "the record of this proceeding contains

evidence that SSV's B&H costs can increase proportionately with the weight of the shipment."

Remand Results 41.  Specifically, Commerce pointed to SSV's contract with its freight

forwarder, which Commerce found to include B&H services.  Remand Results 41.  The "contract

prices are shown on both a [per-container] and a [per-ton] basis."  Remand Results 41; *see also*

Suppl. A&C Resp. app. SC-5, CD 31–35 (Jan 9, 2014), ECF No. 60; Suppl. C&D Resp. app.

SSD-5, CD 55 (Feb. 5, 2014), ECF No. 72.  Commerce reasoned that, because "the stated prices

are available on a [per-ton] basis, . . . the B&H charges in the contract would also be applied on a

[per-ton] basis.  Thus, the information provided by SSV in this investigation shows that its B&H

charges could increase proportionately with the weight of the shipment."  Remand Results 41–

42.  For this reason, Commerce "continued calculating the surrogate value for B&H by dividing

the charges listed in [the Doing Business Report] by the assumed container weight of 10 MT."

Remand Results 42.

## B.  Discussion

SSV presents three reasons why Commerce erred in finding that the B&H charges are

proportional to weight.  SSV Comments 27–-33.

First, SSV claims that "Commerce's allocation provides aberrational results that are

inconsistent with evidence regarding the actual per-unit brokerage and handling costs incurred by

Indian exporters" of OCTG.  SSV Comments 28.   To prove this, SSV cites "information on the

actual expenses reported by Indian producers of OCTG for export brokerage and handling

services, as reported in their questionnaire responses in the concurrent investigation of OCTG

from India."  SSV Comments 28.  SSV explains that these responses indicate that the B&H

figures calculated by Commerce were "7 to 13 times greater than the actual per-ton brokerage

and handling costs reported by" the cited Indian producers of OCTG.  SSV Comments 29–30.

From this, SSV opines that "[t]he only possible conclusion is that the allocation methodology

used in the [Remand Results] is not accurate or reasonable, and must be revised."  SSV

Comments at 30.

Second, SSV asserts that "[t]he only evidence on the record concerning the manner in

which market-economy suppliers charge for [B&H] services confirms that they charge for

document preparation and customs clearance on a per-shipment basis and for other charges on a

per-container basis."  SSV Comments 30.  SSV concedes that the Doing Business Report reflects

Indian B&H expenses.  SSV Comments 30–31.  But it alleges that the only "information on the

record regarding the *manner* in which *Indian* suppliers of [B&H] services set their fees" are

"price lists  from a company that performed [B&H] services at numerous Indian ports."  SSV

Comments 30–31 (emphasis added).  SSV states that "the price lists showed that for document

preparation, there was a flat price per bill of lading that did not depend on the number of

containers or the weight of the cargo."  SSV Comments 30–31.  SSV further states that the price

lists showed that "for handling, . . . there were flat prices per container that depended on the size

and type of container, but not on the weight of the cargo in each container."  SSV Comments 30–

31.  From this, SSV reasons that the B&H costs in the cited price lists would not "have increased

if the container held more than 10 tons, or decreased if the container held less than 10 tons."

SSV Comments 31 (citation omitted).  Therefore, SSV insists that "any calculation" using Indian

surrogate values that assumes a proportional relationship between cost and weight "is necessarily

contrary to the evidence on the record."  SSV Comments 31.

       Third, SSV contends that "Commerce's reliance on the price formula in SSV's contract

with an NME freight forwarder is unreasonable."  SSV Comments 32.  SSV argues:

> The pricing practice on which [Commerce] relies . . . is not a market-economy
> transaction.  The entire rationale underlying the NME methodology is that the NME
> suppliers do not act in accordance with market principles.  Under the statute, then,
> Commerce is simply not permitted to assume that a market-economy-provider of
> brokerage and handling services would set prices in the same manner as a non-market
> economy provider.  Commerce cannot, in good faith, rely on the fee structure used by
> SSV's Vietnamese supplier to identify how a market-economy supplier in India would
> have set its fees.

SSV Comments 32–33.  Stated differently, SSV insists that, "if Commerce is going to hold that

the forwarder's status as an NME supplier means that its charges are unreliable, then it must

consider those charges to be unreliable for all purposes—including for purposes of determining

how a market-economy service provider would set its fees."  SSV Comments 33.  As it stands,

SSV views Commerce's methodology as "fundamentally illogical and contrary to the statute."

SSV Comments 33.

In response to the above arguments from SSV, Commerce simply stated: "[W]ith respect to the price lists placed on the record by SSV pertaining to certain Indian suppliers, we find no evidence on the record supports the claim that SSV or other Vietnamese exporters charge document preparation and customs clearance by amount per transaction, and other associated B&H costs charged by amount per container." Remand Results 68 (citation omitted).

Commerce must say more. SSV argued that, even if SSV's freight forwarder charged B&H costs proportional to the weight of exports and imports, Commerce still erred. SSV insisted that it was improper to impute a NME price formula to a ME supplier of B&H services. SSV also cited evidence that Indian B&H providers do not charge on the basis of weight, possibly making it inappropriate to allocate an Indian B&H surrogate value on the basis of weight. Commerce never responded to these legitimate critiques, and the court cannot manufacture an answer for Commerce. *SEC v. Chenery*, 332 U.S. 194, 196 (1947) (explaining that courts must "judge the propriety of [Commerce's] action solely by the grounds invoked by the agency."). Until Commerce explains why, despite SSV's challenges, its decision is correct, the court cannot find that Commerce's decision was consistent with the law and supported by substantial evidence. And so the court remands for Commerce to either change the way it allocates B&H costs or to provide a more robust explanation of its decision to allocate B&H costs in accordance with weight.

## CONCLUSION AND ORDER

For the reasons stated above, the court remands three issues to Commerce for

reconsideration.  Accordingly, after carefully reviewing all briefs and the administrative record,

it is hereby:

**ORDERED** that the Remand Results are remanded to Commerce for redetermination in accordance with this Opinion and Order; it is further

**ORDERED** that Commerce issue a redetermination in accordance with this Opinion and Order that is in all respects supported by substantial evidence and in accordance with law; it is further

**ORDERED** that Commerce either (1) provide a comprehensive explanation of its decision to discard SSV's ME purchases of J55-H as a surrogate value for J55-H or (2) recalculate the surrogate value for J55-H; it is further

**ORDERED** that Commerce either (1) more fully explain why the Argo Dutch data, despite its shortcomings, represent the best available information or (2) modify its decision to rely on the Argo Dutch data as a surrogate value; it is further

**ORDERED** that Commerce either (1) respond to SSV's challenges to its allocation of B&H costs and provide an explanation that is consistent with the law and supported by substantial evidence or (2) change its allocation of B&H costs and provide an explanation for the change that is consistent with the law and supported by substantial evidence; it is further

**ORDERED** that Commerce shall have ninety (90) days from the date of this Opinion and Order in which to file its redetermination, which shall comply with all directives in this Opinion and Order; that the Plaintiff and Defendant-Intervenors shall have thirty (30) days from the filing of the redetermination in which to file comments thereon; and that the Defendant shall have thirty (30) days from the filing of Plaintiff's and Defendant-Intervenors' comments to file comments.

           /s/ Richard W. Goldberg
                  Richard W. Goldberg
                          Senior Judge

Dated:  September 28, 2017
New York, New York